151 T.C. No. 9

UNITED STATES TAX COURT

DAVID H. MELASKY AND AUDREY MELASKY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12777-12L.                    Filed October 10, 2018.

This CDP case involves Ps' 2006, 2008, and 2009 income tax
liabilities.  Ps gave R a check which they asked to have applied
against their 2009 income tax liability.  Before the check was
deposited, R levied on Ps' bank account (against which the check had
been drawn) with respect to other tax liabilities Ps owed.  Ps' check
subsequently failed to clear.  R applied the proceeds of the levy
against Ps' 1995 income tax liability.  Ps contend that the proceeds of
the levy should be applied against their 2009 income tax liability.

Ps also requested a partial payment installment agreement but
failed to pay over their equity in certain assets after three deadline
extensions over about 4.5 months.  R determined that Ps would be
able to rely on distributions from a trust to pay a portion of their
necessary expenses and that Ps could therefore afford a greater
monthly payment than they had proposed.  For these reasons, R
denied the installment agreement Ps had proposed.

Held: Because Ps' check was dishonored, it was not a payment. The levy proceeds were an involuntary payment, and therefore R did not abuse his discretion in applying the levy proceeds against Ps' 1995 income tax liability.

Held, further, R's determination to deny Ps' installment agreement proposal was not an abuse of discretion.

Juan F. Vasquez, Jr., and Renesha N. Fountain, for petitioners.

Susan Kathy Greene, for respondent.

OPINION

THORNTON, Judge: In this collection due process (CDP) case, petitioners seek review pursuant to section 6330(d)(1) of respondent's determination to sustain a proposed levy to collect unpaid income tax for 2006, 2008, and 2009.[1] Respondent has moved for summary judgment under Rule 121. Petitioners object to respondent's motion and have filed a cross-motion for summary judgment. The issues remaining for decision are (1) whether respondent abused his discretion in denying petitioners' request to apply certain proceeds of a prior levy against their

_____

[1] All section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. Amounts have been rounded to the nearest dollar.

2009 income tax liability and (2) whether respondent abused his discretion in rejecting the installment agreement petitioners proposed during the CDP hearing.

Background

The following undisputed facts are derived from the parties' filings. Petitioners resided in Texas when they petitioned this Court.

Petitioners filed joint returns for their 1995, 1996, 1999, 2000, 2001, 2002, 2003, 2004, 2006, 2008, and 2009 income tax years, and on the basis of those returns respondent has assessed, at different times, various amounts, including interest and additions to tax, with respect to each tax year.[2] Petitioners have not disputed that they are liable for the amounts assessed for these years.

Since 1997 petitioners have submitted several proposed collection alternatives with respect to certain years, and respondent has attempted in various ways to collect the unpaid amounts. As described more fully below, this case concerns respondent's attempts to collect petitioners' income tax for 2006, 2008, and 2009, but certain facts relating to other years are relevant to this case and are therefore described as necessary.

---

[2]On June 29, 2009, respondent also made an additional assessment of $2,475 with respect to 2006. This assessment does not appear to have been based on the 2006 return; petitioners have not disputed the validity of this assessment.

Between 1997 and 2006 petitioners submitted four successive offers-in-compromise (OIC): on June 5, 1997 (with respect to their 1995 and 1996 income tax liabilities); on November 4, 1997 (with respect to their 1995 and 1996 income tax liabilities); on April 6, 2004 (with respect to their 1995, 1996, 1999, 2000, 2001, and 2002 income tax liabilities); and on May 17, 2006 (with respect to their 1995, 1996, 1999, 2000, 2001, 2002, 2003, and 2004 income tax liabilities). Respondent initially accepted petitioners' November 4, 1997, offer but later determined that they had failed to meet its terms.[3] Respondent denied petitioners' other three offers.

Meanwhile, respondent initiated collection activities with respect to these years on various occasions. Respondent issued Letters 1058, Final Notice of Intent to Levy and Notice of Your Right to a Hearing, to petitioners on November 6, 2001 (with respect to their 1999 income tax liability), on January 18, 2002 (with respect to their 2000 income tax liability), on June 20, 2002 (with respect to their 1995 income tax liability), and on September 19, 2005 (with respect to their 1996, 2001, 2002, and 2003 income tax liabilities).

---

[3]Petitioners made three payments pursuant to this OIC. These payments were applied against their 1995 income tax liability.

In 2006 petitioners proposed and respondent accepted an installment agreement, which was established on November 6, 2006 (with respect to their 1995, 1996, 1999, 2000, 2001, 2002, 2003, and 2004 income tax liabilities). The record reflects that petitioners began paying on this plan in December 2006. On April 13, 2009, respondent determined that petitioners were no longer in installment agreement status.[4] On April 23, 2009, respondent issued a notice of intent to levy with respect to petitioners' 1995, 1996, 1999, 2000, 2001, 2002, 2003, and 2004 income tax liabilities.

On August 28, 2009, the parties entered into a second installment agreement (or perhaps a revision of their earlier agreement[5]), this time with respect to petitioners' 1995, 1996, 1999, 2000, 2001, 2002, 2003, 2004, and 2006 income tax liabilities.[6] The record reflects that petitioners ceased paying on this agreement

---

[4]It would appear that petitioners missed a payment in June 2008 and may have been late on payments thereafter.

[5]The record reflects that petitioners paid the same amount per month under both the first and second installment agreements, i.e., $1,483.

[6]Additionally, it would appear that on December 19, 2009, this agreement was expanded to include petitioners' 2008 income tax liability.

after January 2010.[7]  On March 15, 2010, respondent determined that petitioners were no longer in installment agreement status.

In addition to the foregoing, petitioners made a $22,899 payment on January 29, 2010 (i.e., at roughly the same time they ceased paying on their installment agreement); this payment, which does not appear to have been associated with their installment agreement, was applied against their 2008 income tax liability, apparently in accord with their instructions (but did not fully satisfy that liability).

Similarly, on January 27, 2011 (i.e., roughly one year later), petitioners hand-delivered to the Internal Revenue Service (IRS)--at the IRS office in Houston, Texas--an $18,000 check from their account at JP Morgan Chase, NA. They requested that the check be applied against their 2009 income tax liability (slightly more than $18,000).  Respondent initially applied the check against petitioners' 2009 income tax liability.

On January 31, 2011, respondent issued a notice of intent to levy with respect to petitioners' 2001, 2002, 2004, 2006, 2008, and 2009 income tax

---

[7]Of the payments petitioners made on their installment agreements, all were applied against their 1999 income tax liability except for the December 18, 2006, September 30, 2009, and January 5, 2010, payments.  These payments were applied against their 1995, 2006, and 2000 income tax liabilities, respectively.

liabilities.[8]  Also on January 31, 2011, respondent issued to petitioners' bank, JP Morgan Chase, NA, a notice of levy with respect to petitioners' 1995, 1996, 1999, 2000, 2001, 2002, 2003, and 2004 income tax liabilities;[9] respondent simultaneously issued to petitioners Form 8519, Taxpayer's Copy of Notice of Levy, which informed petitioners of the levy on their bank account.[10]  As a result of the notice of levy, petitioners' bank placed a hold on their account.

On February 9, 2011, petitioners submitted to respondent a Form 12153, Request for a Collection Due Process or Equivalent Hearing, with respect to their unpaid income tax liabilities for 1995, 1996, 1999, 2000, 2001, 2002, 2003, 2004, 2006, 2008, and 2009.  Petitioners checked the boxes for "Installment Agreement", "Offer in Compromise", and "Other".  In the space provided next to the "Other" box, petitioners referred respondent to an attachment.  In their attachment, petitioners contended that the period of limitations on collection had expired with respect to their tax liabilities for 1995 and 1996.  Petitioners also noted that their January 27, 2011, check had not been deposited as of January 31,

---

[8]This notice was issued from an IRS office in Philadelphia, Pennsylvania.

[9]As described, respondent had issued on previous occasions at least one notice of intent to levy with respect to each of these liabilities.

[10]The Form 8519 was also issued from an IRS office in Philadelphia, Pennsylvania.

2011, and that JP Morgan Chase had placed a hold on their checking account upon receipt of the January 31, 2011, notice of levy. Petitioners requested that the levy proceeds be applied against their 2009 income tax liability.

On February 28, 2011, respondent applied against petitioners' 1995 income tax liability the proceeds of the levy upon their bank account, $21,182.[11] At some point on or before March 7, 2011, respondent attempted to deposit petitioners' January 27, 2011, check. The check did not clear, either because of the hold on petitioners' account (before February 28, 2011) or because the funds in the account had been transferred to the IRS (after February 28, 2011). Because petitioners' check did not clear, respondent reversed application of the check against their 2009 income tax liability.

On July 15, 2011, after a series of preliminary exchanges between the settlement officer (SO) and petitioners' counsel, the SO issued petitioners a letter noting that Appeals had received their request for a CDP hearing and scheduling a face-to-face CDP hearing for August 25, 2011. On or about July 27, 2011, petitioners submitted to the SO a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals.

---

[11]Pursuant to sec. 6332(c), petitioners' bank was required to hold any funds in petitioners' account for 21 days after the January 31, 2011, service of levy before transmitting the funds to respondent.

On August 25, 2011, a CDP hearing was held with respect to petitioners' 2006, 2008, and 2009 income tax liabilities.[12] Petitioners' counsel did not dispute petitioners' underlying liabilities but did discuss the possibility of an OIC and also argued that the proceeds of the levy on petitioners' bank account should be applied against their 2009 income tax liability. By letter dated August 26, 2011, the SO asked that petitioners submit any OIC by September 9, 2011. The August 26, 2011, letter also requested, among other things, that petitioners (1) pay their estimated taxes for January through August 2011, (2) provide a copy of Mrs. Melasky's father's will, and (3) answer a series of questions primarily relating to the income, assets, and expenses of petitioners' business. The August 26, 2011, letter warned petitioners that if these requests were not met, Appeals would issue a notice of determination sustaining the notice of intent to levy.

---

[12]Respondent determined that petitioners were not entitled to a CDP hearing with respect to their 1995, 1996, 1999, 2000, 2001, 2002, 2003, and 2004 income tax liabilities because--as described above--prior notices of intent to levy with respect to those periods had been issued more than 30 days before petitioners submitted their February 9, 2011, Form 12153. See sec. 301.6330-1(b)(2), Q&A-B2, B4, Proced. & Admin. Regs. ("The taxpayer must request the CDP hearing within 30 days of the date of the first CDP Notice provided for that tax and tax period."). Petitioners have not disputed respondent's determination in this regard.

On September 9, 2011, petitioners submitted a request for a partial payment installment agreement, proposing a monthly payment amount of $750.[13] After a series of discussions relating primarily to Mrs. Melasky's father's estate (Farkas estate), respondent issued petitioners another letter on December 2, 2011. The December 2, 2011, letter noted that petitioners had proposed an installment agreement and pointed out that if they wished to pursue it, they would have to liquidate various assets, including four individual retirement accounts (IRAs), two section 401(k) plan accounts, an insurance policy, and some Exxon Mobil stock. The letter advised that petitioners had until December 16, 2011, to liquidate or borrow against these assets and to provide the proceeds to the IRS.

On December 13, 2011, the SO received a telephone call from petitioners' counsel. Petitioners' counsel informed the SO that petitioners would be unable to meet the December 16, 2011, deadline because their daughter was ill. Petitioners' counsel indicated that petitioners intended to use certain of the assets described in the December 2, 2011, letter to pay medical expenses. Petitioners' counsel also indicated that Mrs. Melasky's income decreased after petitioners had submitted

---

[13]Nothing in the record suggests that petitioners sought to maintain their initial request for an OIC, nor have petitioners raised any dispute with respect to any such offer during these proceedings.

their Form 433-A. The parties agreed that petitioners would provide documentation of medical expenses by the first week of January.

On January 24, 2012, petitioners' counsel called to ask for a second extension with respect to the SO's requests in his December 2, 2011, letter. Petitioners' counsel indicated that petitioners' daughter remained ill. The SO agreed to another, "final", extension of the deadline to February 9, 2012. On January 25, 2012, the SO issued petitioners a letter confirming the extended deadline with respect to the requests laid out in the December 2, 2011, letter. In addition, the SO requested that petitioners provide, among other things, proof that (1) they had liquidated the assets described in the December 2, 2011, letter to pay their daughter's medical bills (along with proof that such amounts had not been reimbursed through insurance) and (2) proof that Mrs. Melasky's income had decreased permanently (as petitioners had claimed).

On February 9, 2012--the date of the "final" extended deadline for liquidating the assets--petitioners' counsel sent the SO a letter outlining petitioners' progress. This letter indicated that between February 3 and 7, 2012, petitioners had begun to take various steps to liquidate some of their assets. The letter indicated that petitioners were waiting for paperwork with respect to two of the IRAs and the two section 401(k) accounts and were expecting a check with

respect to another IRA. The letter indicated that liquidation of these assets would take up to 25 days. The letter also claimed that the Exxon Mobil stock was jointly owned by Mr. Melasky and his former spouse (without whose permission the stock could not be sold, according to petitioners). The letter noted that certain medical expense receipts with respect to petitioners' daughter had been enclosed, along with a bank statement showing that Mrs. Melasky's most recent paycheck was in an amount less than usual. Finally, the letter indicated that $9,239 had been withdrawn from the Farkas estate account to pay some of petitioners' daughter's medical expenses. The documents petitioners submitted did not indicate that any of the assets listed in the December 2, 2011, letter had been used to pay medical expenses, nor did they support a conclusion that Mrs. Melasky's income had decreased permanently.

Meanwhile, the parties had begun to discuss whether the monthly payment amount petitioners had proposed--$750--was sufficient. The SO accepted in all respects the wage and business income petitioners reported on their Form 433-A, except that the SO increased Mrs. Melasky's wages to accord with her 2011 Form W-2, Wage and Tax Statement. The SO also accepted all of the insurance and out-of-pocket health expenses petitioners had reported on their Form 433-A and allowed more expenses in the aggregate than petitioners had reported on their

Form 433-A. The parties disagreed, however, as to whether Mrs. Melasky would be able to rely on distributions from a trust (Farkas trust[14]) created in her father's will (Farkas will) to pay a portion of her living expenses.[15]

The Farkas will provides in relevant part:[16]

ARTICLE 4 - * * * [MRS. MELASKY'S] TRUST

4.1. Creation Of Trusts. All property that passes subject to the provisions of this Article that otherwise would be distributable to a child of mine shall instead be distributed to the Trustee as a separate Child's Trust named for the child, to be administered as provided in this Article. When used in this Article, the words "the trust" means the Trust named for * * * [Mrs. Melasky].

4.2. Distributions During * * * [Mrs. Melasky's] Life To * * * [Mrs. Melasky] And Descendants. During * * * [Mrs. Melasky's] life, the Trustee may distribute to * * * [Mrs. Melasky], as primary beneficiary, and may distribute to her descendants (if any), as

---

[14]Mrs. Melasky's father, Emery Farkas, died on January 13, 2011. His will created a series of trusts. We simplify our description of the facts by confining our discussion to the specific trust at issue.

[15]On or about March 2, 2012, the SO asked respondent's estate tax Appeals officer whether he could request that petitioners access Mrs. Melasky's trust directly to pay their tax liabilities. Respondent's officer concluded that the SO could not make such a request but also concluded that trust distributions could be taken into account when calculating petitioners' ability to pay for purposes of an installment agreement.

[16]The Farkas will is included in the administrative record. Petitioners did not present any other evidence of Mrs. Melasky's father's intent, such as a declaration or affidavit setting forth witness testimony or other similar documentation.

secondary beneficiaries, so much or all of the income and principal of * * * [Mrs. Melasky's] trust (even though exhausting the trust) as the Trustee determines to be appropriate to provide for their continued health, maintenance, support, and education (including college or vocational, graduate or professional school education).

4.3. Termination And Final Distribution Upon * * * [Mrs. Melasky's] Death. Upon * * * [Mrs. Melasky's] death [the] trust shall terminate and the remaining trust property, if any, shall be disposed of as follows.

A. Testamentary Powers Of Appointment. * * * [Mrs. Melasky] shall have a Testamentary General Power of Appointment over the GST Taxable portion of her trust. As to the remaining property of the trust, if any, * * * [Mrs. Melasky] shall have a Testamentary Limited Power of Appointment, exercisable in favor of any one or more of the following: my descendants and any public, charitable and religious organizations. * * *

B. Distribution To Descendants. If * * * [Mrs. Melasky] does not fully exercise her Powers of Appointment, the remaining unappointed property of the trust, if any, shall be distributed per stirpes: (i) to * * * [Mrs. Melasky's] descendants who survive * * * [Mrs. Melasky], if any, otherwise, (ii) to my descendants who survive * * * [Mrs. Melasky], if any.

\*        \*        \*        \*        \*        \*        \*

ARTICLE 9 - ADMINISTRATIVE PROVISIONS

9.1. Discretionary Distribution Considerations. Except as otherwise provided, in making discretionary distributions under this Will, the Trustee making the distribution decision may consider all circumstances and factors the Trustee deems pertinent, including:

(i) the beneficiaries' accustomed standard of living and station in life; (ii) all other income and resources reasonably available to the beneficiaries and the advisability of supplementing their income or resources; (iii) the beneficiaries' respective character and habits, their diligence, progress and aptitudes in acquiring an education, and their ability to handle money usefully and prudently, and to assume the responsibilities of adult life and self-support in light of their particular abilities and disabilities; and (iv) the tax consequences of the Trustee's decision to make (or not to make) the distributions and out of which trust any distributions should be made.  Except as otherwise provided, as to any trust with more than one beneficiary, the Trustee may make discretionary distributions in equal or unequal proportions and to the exclusion of any beneficiary.  The Trustee shall not allow a beneficiary who reasonably should be expected to assist in securing his or her own economic support to become so financially dependent upon distributions from any trust that he or she loses an incentive to become productive in a manner that is reasonably commensurate with any other individual having the ability and being in the circumstances of the beneficiary.  Whenever this Will provides that the Trustee "may" make a distribution, the Trustee may, but need not, make the distribution.

\* \* \* \* \* \* \*

9.6.  <u>Spendthrift Trust</u>.  Each trust created under this Will shall be a "spendthrift trust," as defined by the Texas Trust Code.  Prior to actual receipt by any beneficiary, no income or principal distributable from a trust created under this Will shall be subject to anticipation or assignment by any beneficiary or to attachment by any creditor of, person seeking support from, person furnishing necessary services to, or assignee of any beneficiary.

\* \* \* \* \* \* \*

9.22.  <u>Applicability Of Texas Trust Code</u>.  To the extent consistent with the other provisions of this Will, and to the maximum extent allowed by law, (i) a Fiduciary shall have the powers, duties, and

liabilities of trustees set forth in the Texas Trust Code, as amended and in effect from time to time, and (ii) the construction, validity and administration of every trust created under this Will shall be governed by Texas law.

The Farkas trust held approximately $236,967 as of April 2011.[17]

Over the course of March 2012 petitioners liquidated and paid over to respondent all the assets listed in the December 2, 2011, letter (the proceeds of which were applied against their 2011 income tax liability) except for one IRA, one section 401(k) account, the insurance policy, and the Exxon Mobil stock. On April 4, 2012, the SO issued petitioners another letter, noting that they had not yet liquidated these remaining assets and extending the deadline again to April 11, 2012. The April 4, 2012, letter also provided a preliminary calculation of a monthly payment amount, taking into account all of the insurance and out-of-pocket medical expenses requested by petitioners and projected distributions from the Farkas trust. This calculation did not take into account any decrease in Mrs. Melasky's income.[18] The April 4, 2012, letter calculated an ability to pay of

---

[17]There was some dispute regarding this amount following the CDP hearing, but the record reflects that petitioners appear to have agreed on April 3, 2012, to the SO's calculation of this amount, and they have not maintained in this Court any dispute as to the value of the trust corpus.

[18]Nothing in the record suggests that petitioners ever offered evidence to prove that Mrs. Melasky's income had been permanently diminished. Petitioners

(continued...)

$1,017 in the absence of trust distributions and an ability to pay of at least $4,580 with trust distributions. The letter therefore proposed a monthly payment amount of $4,580 for 51 months (at which time--according to the SO's calculation--the funds in the Farkas trust would be exhausted) and a monthly payment amount of $1,017 thereafter.

The parties now agree that an addition error in the April 4, 2012, letter resulted in the SO's miscalculating petitioners' expenses, which in turn resulted in (1) an error in calculation of the $1,017 amount (the actual amount should have been $829) and (2) an error in the SO's calculation of the amount Mrs. Melasky would be able to distribute from the Farkas trust.

With respect to calculation of the projected trust distributions, in the April 4, 2012, letter the SO reasoned that because Mrs. Melasky contributed 68% of the household income, she would pay 68% of the household expenses (this issue remains in dispute). The SO also believed that Mrs. Melasky could not take trust distributions to pay taxes.[19] The parties now agree that petitioners had expenses totaling $8,751 per month, including $1,828 allowed for taxes. Accordingly, 68%

---

[18](...continued)
have maintained no such contention in this Court.

[19]The parties have not disputed this point in this case, and so we deem this issue to have been waived or conceded.

of petitioners' nontax expenses would be $4,708 (($8751 − $1,828) × 0.68), rather than $4,580 (as the letter calculated). Taking these adjustments into account, the April 4, 2012, letter should have calculated a monthly payment amount of $5,537 (i.e., $4,708 (projected trust distributions) + $829 (nontrust net income)).

On April 11, 2012, petitioners responded by letter, offering to pay $1,017 per month under an installment agreement. With respect to the assets described in the December 2, 2011, letter, petitioners' April 11, 2012, letter indicated that petitioners had completed the paperwork to liquidate their remaining IRA and section 401(k) account and were awaiting checks for the funds from the respective financial institutions. The April 11, 2012, letter also requested that petitioners be allowed to pay over an amount equivalent to the cash surrender value of the insurance policy (instead of surrendering the policy). Additionally, the letter once again claimed that the Exxon Mobil stock was owned jointly by Mr. Melasky and his former wife, with whom Mr. Melasky had not communicated; the letter states that Mr. Melasky would not be opposed to signing over his interest in the stock and otherwise had no objection to respondent's seizing the property.

The April 11, 2012, letter represented that petitioners had paid their estimated tax for 2011 and that a $9,325 check was enclosed (which petitioners directed be applied against their 2012 income tax liability). The April 11, 2012,

letter indicated that the $9,325 represented proceeds of liquidation of a defined contribution plan owned by Mrs. Melasky's father.[20]

The April 11, 2012, letter also responded to the SO's analysis of petitioners' ability to pay. Petitioners pointed out that the SO had erred in adding up expenses. Petitioners also objected that the SO had erred in calculating Mrs. Melasky's nontax expenses as 68% of the household nontax expenses. Petitioners contended that they were each responsible for 50% of their household expenses. Finally, petitioners objected that no amount of the funds held in the Farkas trust could be considered as part of an installment agreement analysis. In general, petitioners argued that Mrs. Melasky could not withdraw anything from the trust because petitioners' income was otherwise sufficient to pay their expenses without distributions. Petitioners also argued that the SO's projected exhaustion of the trust would violate the terms of the trust by leaving no amounts for the secondary beneficiaries (generally, Mrs. Melasky's children).

On or about April 13, 2012, the SO reviewed petitioners' April 11, 2012, letter. The record reflects that the SO initially concluded that petitioners had paid over the equity in their remaining assets (because they had paid over $9,325, an

---

[20]Mrs. Melasky received the funds as a nonspousal beneficiary upon the death of her father. Petitioners had not previously reported this asset, which they claim they had not previously known existed.

amount greater than the equity in the remaining IRA, section 401(k) account, insurance policy, and stock). The SO later corrected his conclusions in this respect to note that the $9,325 payment had come from a separate, previously undisclosed asset and that therefore petitioners had not paid over the equity in their assets as requested in the December 2, 2011, letter. The SO also acknowledged that he had erred in adding up petitioners' expenses. With respect to the trust distribution issue, the SO concluded that petitioners were incorrect and decided to close the case and issue a notice of determination.

On April 20, 2012, respondent issued petitioners a notice of determination sustaining the notice of intent to levy. The notice determined that (1) the period of limitations for collection of petitioners' 1995 and 1996 income tax liabilities had not expired, (2) petitioners' request to apply the proceeds of the levy on their bank account against their 2009 income tax liability was denied, and (3) petitioners' proposed installment agreement was rejected.

On May 21, 2012, petitioners filed a timely petition. On July 31, 2013, respondent filed a motion for summary judgment. On November 5, 2013, petitioners filed an objection to respondent's motion and a cross-motion for summary judgment.

Discussion

The Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). The moving party bears the burden of showing that there is no genuine issue of material fact. Sundstrand Corp. v. Commissioner, 98 T.C. at 520. In deciding whether to grant summary judgment, we view the factual materials and inferences drawn from them in the light most favorable to the nonmoving party. Id.

The issues remaining for decision are whether respondent abused his discretion in deciding (1) not to apply against petitioners' 2009 income tax liability the proceeds of the levy on petitioners' bank account and (2) to reject petitioners' proposed installment agreement.[21]

_____

[21]Petitioners have not maintained--in their petition, objection to respondent's motion, or cross-motion--any dispute with respect to the statute of limitations for collection as it applies to their 1995 and 1996 income tax liabilities. We deem them to have waived or conceded any such issue. In any event, this issue would be relevant to this case (which concerns collection of petitioners' 2006, 2008, and 2009 income tax liabilities) only insofar as it relates to whether the proceeds of the levy on petitioners' bank account were properly applied against a liability other than petitioners' 2009 income tax liability. Even if the period of limitations had expired as of the time respondent applied the levy proceeds against petitioners' 1995 income tax liability, their outstanding liabilities

(continued...)

Where the validity of the underlying tax liability was properly at issue in the CDP hearing, the Court reviews the Commissioner's determination de novo. Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). Where the underlying tax liability was not properly at issue, the Court reviews the IRS determination only for abuse of discretion. Id. at 182. As decided today in a separate Opinion, Melasky v. Commissioner, 151 T.C. ___ (Oct. 10, 2018), petitioners' dispute as to whether the proceeds of the levy on their bank account were properly credited against their 1995 income tax liability is not a challenge to the underlying liability for 2009. Petitioners have therefore raised no challenge to their underlying liability, and accordingly we review respondent's determination for abuse of discretion.

In reviewing for abuse of discretion, we will not supply a reasoned basis for the SO's determinations that the SO did not provide, see SEC v. Chenery Corp., 332 U.S. 194, 196-197 (1947), but we will uphold a notice of determination of less than ideal clarity if the basis for the determination may reasonably be discerned,

---

[21](...continued)
for 2000, 2001, 2002, 2003, and 2004 were sufficient to absorb the levy proceeds. That is, even if the period of limitations on collection for the 1995 and 1996 income tax liabilities had expired, the proceeds of the levy would not have been applied against a liability for any of the three years at issue in this case. See Rev. Proc. 2002-26, 2002-1 C.B. 746.

see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-286 (1974) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."); cf. Kasper v. Commissioner, 150 T.C. ___, ___ (slip op. at 27) (Jan. 9, 2018) ("Although we may not accept any post hoc rationalizations for agency action provided by the Commissioner's counsel, we may consider any 'contemporaneous explanation of the agency decision' contained in the record." (quoting Tourus Records, Inc. v. Drug Enf't Admin., 259 F.3d 731, 738 (D.C. Cir. 2001))).

In this case, the notice of determination states that the SO determined not to apply the levy proceeds against petitioners' 2009 liability because the levy was an involuntary payment. The notice of determination also states that the installment agreement was rejected because (1) "the taxpayers have not paid over the equity in all of their assets" and because of (2) "Mrs. Melasky's unwillingness to take any distributions [from the Farkas trust] for her own support and maintenance." As we now explain, these reasons provide a satisfactory basis for the SO's determinations.

## I. Application of Levy Proceeds

It is the Commissioner's policy generally to permit taxpayers who submit "voluntary" payments to designate the tax liability against which the payment will

be applied. United States v. Energy Res. Co., 495 U.S. 545, 548 (1990) (citing IRS v. Energy Res. Co., 871 F.2d 223, 234 (1st Cir. 1989)); Dixon v. Commissioner, 141 T.C. 173, 185-187 (2013); Rev. Proc. 2002-26, sec. 3.01, 2002-1 C.B. 746, 746. On the other hand, involuntary payments may generally be applied against whichever unpaid tax liabilities the Commissioner chooses. Amos v. Commissioner, 47 T.C. 65, 69 (1966); Rev. Proc. 2002-26, sec. 3.03(2).

Petitioners contend that their January 27, 2011, $18,000 check should be treated as a voluntary payment toward their 2009 liability because their check was written and accepted before respondent levied on their bank account. We disagree. There was no payment on January 27, 2011.

A payment by check is a conditional payment because it is subject to the condition subsequent that the check be paid upon presentation to the drawee (i.e., the bank in this case). Estate of Hubbell v. Commissioner, 10 T.C. 1207, 1208 (1948) (citing Eagleton v. Commissioner, 35 B.T.A. 551 (1937), aff'd, 97 F.2d 62 (8th Cir. 1938)); see also, e.g., Muldrow v. Tex. Frozen Foods, Inc., 299 S.W.2d 275, 277-278 (Tex. 1957) ("[I]t is well settled that the mere delivery to a creditor of the check drawn by his debtor does not in itself discharge the debt in the absence of an agreement to that effect."); Lakeway Co. v. Bravo, 576 S.W.2d 926 (Tex. Civ. App. 1979). If this condition subsequent is fulfilled, the payment

generally becomes absolute and is deemed to relate back to the time when the check was provided. See Estate of Belcher v. Commissioner, 83 T.C. 227, 234-235 (1984); Estate of Spiegel v. Commissioner, 12 T.C. 524, 527-529 (1949); Vanney Assocs., Inc. v. Commissioner, T.C. Memo. 2014-184, at *6-*7. In the absence of an agreement, acceptance of a check is not considered absolute payment, and there is a presumption that there is no such agreement. Estate of Hubbell v. Commissioner, 10 T.C. at 1208; Tex. Frozen Foods, Inc., 299 S.W.2d at 277-278.

Nothing in the record suggests, nor have petitioners argued, that there was any agreement that respondent's acceptance of their check would be treated as absolute payment. Consequently, we presume that there was no such agreement. Petitioners' check was therefore subject to the condition subsequent of payment upon presentation to their bank. Ultimately, because of insufficient funds the check was not honored. Accordingly, the condition subsequent not having been satisfied, the check did not constitute payment. Because the check did not constitute payment, any instructions petitioners attached to the check are irrelevant. Taxpayers may direct the application of a payment only if payment occurs.

Petitioners suggest that we ought to create an equitable exception to these straightforward rules for situations in which a taxpayer's check was dishonored following a lawful IRS levy on the bank account against which the check was drawn. Petitioners have cited no authority to support this idea. (The citations in their objection and cross-motion generally relate to whether certain payments were voluntary, not to whether they were payments.[22]) Moreover, we have generally treated checks as they are treated "in everyday personal and commercial usage". Estate of Spiegel v. Commissioner, 12 T.C. at 529. Petitioners have cited, and we are aware of, no case in which a check that was not honored was then treated as a

[22]In addition to citing cases addressing whether a payment is voluntary, petitioners also cite Poindexter v. Greenhow, 114 U.S. 270, 281-282 (1885). In Poindexter the plaintiff owed $12.45 in State taxes on a property in Richmond, Virginia. In payment of the tax, the plaintiff tendered 45 cents and surrendered mature coupons worth $12 that had been cut from bonds issued by Virginia. The defendant, the Treasurer of Richmond, refused pursuant to State law to accept the coupons and instead seized the plaintiff's desk, which was worth $30. The plaintiff challenged the defendant's refusal to accept the coupons as unconstitutional, arguing that the State law upon which the refusal was premised unlawfully impaired the contract embodied in the bond from which the coupons were cut. The case was eventually appealed to the Supreme Court after the defendant refused to give back the plaintiff's desk.

Petitioners' reliance on Poindexter is misplaced. The dispute in that case was whether a particular form of payment--a State bond--could be used to satisfy the plaintiff's tax liability, whereas respondent does not dispute that a check may be used to pay a Federal tax liability. The dispute in this case is whether a check must be treated as payment in the event it is dishonored.

payment (except for situations in which the bank made an error, see Cantlay &

Tanzola, Inc. v. Ingels, 88 P.2d 141 (Cal. Dist. Ct. App. 1939)).

In Tex. Frozen Foods, Inc., 299 S.W.2d at 278, the Supreme Court of Texas

stated:

> We know that collecting officials customarily accept personal checks for taxes. If a check given for this purpose is promptly paid when first presented in due course to the drawee bank, then for all practical purposes the funds are as readily available to the taxing authority as if payment had been made in money. Under these circumstances we would have no difficulty in holding that the check was the legal equivalent of money and that the taxes were discharged when the paper was received by the collecting official. But if the instrument is dishonored when presented to the bank, it cannot be said that the taxes were paid at the time the check was received.
>
> The use of a check to pay taxes is always at the risk of the taxpayer, for whose accommodation the receiving official acts in attempting to collect the same. * * * We hold that when a check given for taxes is properly presented and is dishonored for any reason, its subsequent payment operates to discharge the taxes as of the time of such payment and not before.

There would seem to be no reason to treat a Texas check differently for Federal

tax purposes from the way the Texas Supreme Court would treat it for State tax

purposes.[23]

-----

[23]The dissent contends that Muldrow v. Tex. Frozen Foods, Inc., 299 S.W.2d 275, 277-278 (Tex. 1957), "turned on an old quirk of Texas law that, '[i]n the absence of a constitutional or statutory provision authorizing payment in some other medium, taxes must always be paid in money.'" Dissenting op. p. 74. We

(continued...)

Aside from the fact that there is no caselaw or other authority to support creation of an equitable exception to the normal rules, there is also no apparent reason to do so in this case. As described more fully in the background section, respondent levied on petitioners' bank account and applied the funds against their 1995 income tax liability after approximately 15 years of collection activity. Petitioners have not alleged that there was any procedural defect in respondent's levy. The record reflects that respondent accepted at least one OIC and one installment agreement with respect to 1995 (and considered several others), both of which were eventually terminated because petitioners failed to meet their obligations. Accordingly, it was not unreasonable or inappropriate for respondent to proceed to levy; and in any event respondent had no legal obligation to ensure that petitioners' check was deposited before the levy occurred. Respondent did not cause petitioners' check to bounce; petitioners' check bounced because they

---

[23](...continued)
disagree. Tex. Frozen Foods, Inc. does not turn on any quirk of Texas law. Instead, it recognizes that there is a historical legal principle that payment for public purposes is not necessarily governed by the same rules as payment for private purposes. That said, the court concludes that a check presented to satisfy a State tax liability and ultimately dishonored will be treated exactly as it would be treated in the private situation, i.e., as no payment at all.

In short, the dissent has it backwards: Rather than making a holding contrary to the normal rules on the basis of State constitutional law, the Texas Supreme Court considered constitutional law and ultimately determined that it supported application of the normal rule in the case of a dishonored check.

owed and have chronically failed to pay various taxes, a portion of which was collected by levy after respondent's many attempts at compromise failed to reach a voluntary resolution.[24]

There is no dispute that the $21,182 payment at issue was a result of respondent's levy. Amounts received as a result of levy are involuntary payments. E.g., Amos v. Commissioner, 47 T.C. at 69. As explained above, the Commissioner may apply involuntary payments as he sees fit, and therefore respondent was not required to apply the proceeds of the levy against petitioners' 2009 income tax liability. For this reason, we conclude that there was no abuse of discretion in respondent's determination to deny petitioners' request to apply the proceeds of the January 27, 2011, levy against their 2009 income tax liability.

## II. Installment Agreement

Section 6159 authorizes the Commissioner to enter into written agreements allowing taxpayers to pay tax in installment payments if he deems that the

___

[24]The dissent contends that we have concluded that the Melaskys are "really, really bad". Dissenting op. p. 60. We have not formed any opinions about the Melaskys or their intentions, nor do we think such opinions would be relevant. All we do here is apply the straightforward commercial rules for checks. We have set out the procedural history at length above, not because we are deciding this case on the basis of petitioners' intentions, but to make clear that the record provides no evidence of any legal defect in respondent's levy. Certainly, the record provides no basis for the dissent's position that we should override the normal commercial rules for dishonored checks in pursuit of equity.

"agreement will facilitate full or partial collection of such liability." The decision to accept or reject installment agreements lies within the discretion of the Commissioner. Thompson v. Commissioner, 140 T.C. 173, 179 (2013); sec. 301.6159-1(a), (c)(1)(i), Proced. & Admin. Regs. The Court does not make an independent determination of what would be an acceptable collection alternative. Thompson v. Commissioner, 140 T.C. at 179. If the SO followed all statutory and administrative guidelines and provided a reasoned, balanced decision, the Court will not reweigh the equities. Id.

The installment agreement petitioners proposed was a partial payment installment agreement (i.e., petitioners proposed to pay in installments only part of their total liability). The Commissioner has created guidelines for an SO to follow in deciding the terms of a partial payment installment agreement. See, e.g., id.; Internal Revenue Manual (IRM) pt. 5.14.2.1 (Mar. 11, 2011). "Before a * * * [partial payment installment agreement] may be granted, equity in assets must be addressed and, if appropriate, be used to make payment." IRM pt. 5.14.2.1(2). Additionally, "[t]he taxpayer must agree to pay the maximum monthly payment based upon the taxpayer's ability to pay." Id. pt. 5.14.2.1.1(7).

The Commissioner generally determines a taxpayer's ability to pay by subtracting allowable monthly expenses from the taxpayer's monthly income. For

purposes of a partial payment installment agreement, the taxpayer is allowed his or her "necessary expenses". See, e.g., Thompson v. Commissioner, 140 T.C. at 179-180. Necessary expenses are those "expenses that are necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income. The expenses must be reasonable. The total necessary expenses establish the minimum a taxpayer and family needs to live." IRM pt. 5.15.1.7(1) (Oct. 2, 2009).

Petitioners proposed an installment agreement with a $750 monthly payment and later increased their offer to $1,017 per month. In the notice of determination, respondent provided two reasons for rejecting these proposals: (1) petitioners had not liquidated the equity in their assets as requested and (2) the monthly payment amounts were less than petitioners could pay. Either of these reasons would be an independently sufficient basis for respondent to reject the proposed installment agreement. As discussed below, we conclude that respondent did not abuse his discretion with respect to either rationale.

A. Equity in Assets

Respondent did not abuse his discretion in rejecting petitioners' installment agreement proposals after determining that they had failed to liquidate certain assets and pay over the proceeds. When they requested a CDP hearing on February 9, 2011, petitioners had been through the installment agreement request

process at least twice and were represented by counsel throughout this case. Consequently, as of February 9, 2011, they knew or should have known that equity in assets would have to be addressed.

On December 2, 2011, respondent requested that petitioners liquidate the assets in question by December 16, 2011. Petitioners initially indicated, on December 13, 2011, that they intended to use the equity in certain of those assets to pay medical expenses. The SO agreed that petitioners could use those assets for medical expenses, and the parties agreed that petitioners would provide proof that the equity had been used for that purpose. Respondent extended the deadline to the first week of January 2012 to accommodate petitioners' situation.

On January 24, 2012, petitioners asked for a second extension, to which the SO agreed, and the SO again asked for proof that the equity in petitioners' assets had been used for medical expenses. On February 9, 2012, petitioners asked for a third extension of the deadline, but their reason for delay had changed: They no longer claimed that they would pay medical expenses with the equity in their assets. Instead, they agreed that they would pay over the proceeds to respondent.

On April 4, 2012, respondent extended the deadline to April 11, 2012, for the assets that remained unliquidated. On April 11, 2012, petitioners indicated that they had completed the paperwork to liquidate their remaining IRA and

section 401(k) account and were awaiting checks for the funds from the respective financial institutions. They also requested to be allowed to pay over an amount equivalent to the cash surrender value of the insurance policy (instead of surrendering the policy). Additionally, they claimed that the Exxon Mobil stock was owned jointly by Mr. Melasky and his former wife, with whom Mr. Melasky had not communicated; petitioners stated that Mr. Melasky would not be opposed to signing over his interest in the stock and otherwise had no objection to respondent's seizing the property. As of April 20, 2012, when respondent issued the notice of determination, petitioners had not paid over any amounts relating to these four assets. In fact, petitioners do not contend that they have ever paid over the equity in these four assets to respondent.

In short, on December 2, 2011, respondent asked petitioners to liquidate their assets and pay over the proceeds; they had not done so as of April 20, 2012, when the notice of determination was issued. We cannot say that the SO abused his discretion in declining to extend the deadline yet again, after three previous extensions over a period of approximately 4.5 months.

Instead, it is clear from the record that any delay is attributable to petitioners. Petitioners initially claimed that they would use the equity in their assets to pay medical expenses. The record shows that they did not begin

liquidating their assets until February 2012 after being asked twice to prove that they were actually using their equity for medical expenses. Even viewing the facts in the light most favorable to petitioners and assuming that they were sincere in initially claiming that they would pay medical expenses with their assets, their reason for delay in paying over funds derived from liquidating their assets does not explain their failure to begin liquidating those assets in pursuit of their stated plan to pay medical expenses.

Furthermore, whatever difficulty petitioners might have had in communicating with Mr. Melasky's former wife does not change the fact that Mr. Melasky owned an interest in the Exxon Mobil stock. Petitioners do not contend that Mr. Melasky would have been unable to liquidate his interest in that stock by communicating with his former spouse, initiating a partition action in the appropriate court, or borrowing against his interest in the stock. It was not unreasonable for the SO to ask Mr. Melasky to do so.[25] Petitioners offered to

---

[25]As petitioners point out, the Internal Revenue Manual (IRM) recognizes in an example that property held as a tenancy by the entirety, i.e., held at common law by a married couple, may be difficult to liquidate. See IRM pt. 5.14.2.1.2(2)(b) (Mar. 11, 2011). In some common law property States tenants by the entirety may not make--during their marriage--an absolute disposition of their interests without spousal consent. E.g., Evans v. Evans, 772 S.E.2d 576, 580 (Va. 2015). (We cite Virginia law as an example because Texas is not a common law property State, and the record does not disclose under which State's laws Mr.

(continued...)

allow respondent to seize Mr. Melasky's interest in the Exxon Mobil stock. This was not an acceptable alternative because the Commissioner must generally sustain a notice of intent to levy and issue a notice of determination before he can proceed to seize assets. That is, the supposed alternative petitioners offered was not actually available to respondent in the then-current prelevy procedural posture. In any event, it is petitioners' obligation--and not respondent's duty--to address the equity in their assets during installment agreement negotiations.

On these facts, it was not an abuse of discretion for the SO to conclude that petitioners--having repeatedly failed over about 4.5 months and with three

---

[25](...continued)
Melasky was married or divorced.) "[C]onsistent with this restriction on alienability, no creditor of only one spouse can attach property held by both spouses as tenants by the entirety." Id. Hence the IRM's example relating specifically to circumstances where only one spouse owes the tax. But because he had divorced his former spouse, Mr. Melasky could not have held the stock as a tenant by the entirety. (Also, in some States property other than real estate may not be held as a tenancy by the entirety. E.g., Hawthorne v. Hawthorne, 192 N.E.2d 20 (N.Y. 1963).) Either by operation of law or under their divorce agreement, whatever ownership interest Mr. Melasky might have had during his prior marriage was thereby converted to some other interest, such as a tenancy in common. E.g., Va. Code Ann. sec. 20-111 (2018).

deadline extensions to pay over the equity in their assets--were not entitled to the

installment agreement they had proposed.[26]

_____

[26]The dissent contends that the SO concluded "without any analysis that failing to liquidate every asset is an automatic bar to getting a * * * [partial payment installment agreement]". Dissenting op. p. 90. Contrary to the dissent's suggestion, the relevant question is not whether the SO could require petitioners to liquidate every one of these assets. Petitioners initially had told the SO that they intended to liquidate some or all of these assets to pay medical expenses. (The SO said he would allow this if petitioners offered proof that they had done so.) Consequently, we do not think that the discussions between petitioners and the SO were ever about whether the assets would be liquidated. Rather, they seem to have focused on whether the assets would be used for medical expenses or to pay taxes. Accordingly, the real issue is whether the SO afforded petitioners enough time to liquidate their assets and either use the proceeds on medical expenses or pay them over to respondent.

The SO is under a duty to resolve issues as expeditiously as possible under the circumstances. Sec. 301.6330-1(e)(3), Q&A-E9, Proced. & Admin. Regs. ("Appeals will * * * attempt to conduct a * * * [section 6330] hearing and issue a [n]otice of [d]etermination as expeditiously as possible under the circumstances."). As we have explained, 4.5 months and three deadline extensions is enough time, at least under the circumstances presented here. Cf. Shanley v. Commissioner, T.C. Memo. 2009-17; Gazi v. Commissioner, T.C. Memo. 2007-342, 94 T.C.M. (CCH) 474, 479 (2007) ("There is no requirement that the Commissioner wait a certain amount of time before making a determination as to a proposed levy.").

Additionally, we do not understand the dissent's citation of United States v. Craft, 535 U.S. 274, 283, 288 (2002), and Notice 2003-60, 2003-2 C.B. 643, 645. See dissenting op. p. 89. As we have explained, see supra note 25, as of the time of the CDP hearing Mr. Melasky cannot possibly have held the Exxon Mobil stock as a tenant by the entirety. We also do not understand the dissent's citation of sec. 6323(b)(1). See dissenting op. note 21. Sec. 6323 applies to situations in which a lien arises before a security was purchased or before a security interest in a security came into existence, i.e., it protects third parties rather than the taxpayer. Petitioners contend that Mr. Melasky purchased the stock with his former spouse. The liabilities at issue in this case are joint liabilities of petitioners, i.e., joint

(continued...)

B. Trust Distributions

Neither was it an abuse of discretion for respondent to reject petitioners'

installment agreement proposals after determining that petitioners would be able

to rely on distributions from the Farkas trust for the purpose of paying a portion of

their nontax expenses.

The Farkas trust was created under Mr. Farkas' will. We generally apply

State law in interpreting wills. See, e.g., Estate of Craft v. Commissioner, 68 T.C.

249 (1977), aff'd, 608 F.2d 240 (5th Cir. 1979). As expressly provided in article

9.22 of the will, Texas law governs the Farkas will. Under Texas law, extrinsic

evidence may be considered to construe the terms of a will only when the terms

are open to more than one construction. E.g., San Antonio Area Found. v. Lang,

35 S.W.3d 636, 639 (Tex. 2000). Whether a written instrument is ambiguous is a

question of law. E.g., Richardson v. Mills, 514 S.W.3d 406, 413 (Tex. 2017).

The Farkas will is not ambiguous in any relevant respect. It provides

discretionary authority to the trustee, Mrs. Melasky, to distribute so much of the

income or principal (i.e., the corpus) as appropriate to provide for the

---

[26](...continued)
liabilities of Mr. Melasky and his current spouse. Consequently, their tax
liabilities (and therefore any liens) arose after the Exxon Mobil stock was
purchased, not before.

beneficiaries' "continued health, maintenance, support, and education".  The SO's

determination included trust distributions only to the extent that those projected

funds would be used to pay nontax necessary expenses, i.e., expenses for food,

clothing, housing, utilities, vehicles, health insurance, out-of-pocket medical costs,

and life insurance.  Because these necessary expenses are "the minimum a

taxpayer and family needs to live", IRM pt. 5.15.1.7(1), they are clearly within the

meaning of the terms "health, maintenance, support, and education".  Therefore

the plain terms of the Farkas will permit Mrs. Melasky to distribute funds to pay at

least her share of the necessary expenses determined by the SO.

We note that the Texas Trust Code provides a special rule applicable where,

as here, the same person is both trustee and beneficiary:

> [A] person, other than a settlor, who is a beneficiary and trustee, * * *
> of a trust that confers on the trustee a power to make discretionary
> distributions to or for the trustee's * * * personal benefit may exercise
> the power only in accordance with an ascertainable standard relating
> to the trustee's * * * individual health, education, support, or
> maintenance within the meaning of Section 2041(b)(1)(A) or
> 2514(c)(1), Internal Revenue Code of 1986 * * *

Tex. Prop. Code Ann. sec. 113.029(b)(1) (2014).[27]  Consequently, Mrs. Melasky's

discretion to distribute is limited under Texas law, which looks to the meaning of

"health, education, support, or maintenance" as defined under section

2041(b)(1)(A) or 2514(c)(1).

Sections 20.2041-1(c)(2), Estate Tax Regs., and 25.2514-1(c)(2), Gift Tax

Regs., provide that "the words 'support' and 'maintenance' are synonymous and

their meaning is not limited to the bare necessities of life."  The SO determined

that the funds withdrawn from the Farkas trust would be used to pay necessary

expenses.  As discussed, necessary expenses are "the minimum a taxpayer and

family needs to live", IRM pt. 5.15.1.7(1), or in other words, the bare necessities

of life.  Consequently, a distribution for the purpose of paying Mrs. Melasky's

share of necessary expenses would not be restricted under Tex. Prop. Code sec.

113.029(b)(1).

Petitioners object, suggesting that under Texas law the terms of the Farkas

trust do not permit Mrs. Melasky to make distributions to herself--even to pay her

share of expenses relating to her health, maintenance, support, and education--to

---

[27]Tex. Prop. Code Ann. sec. 113.029(d) (2014) provides exceptions to this rule for certain situations involving the settlor's spouse, revocable trusts, and certain transfers for the benefit of minor children which pass to the child upon his or her attaining the age of 21 years.  As those situations are not presented in this case, these exceptions do not apply to the Farkas trust.

the extent she had other income or assets available to pay those expenses. Consequently, they contend, the SO erred in concluding that petitioners would be able to rely on distributions from the trust to help defray their nontax living expenses. We are not persuaded. Petitioners' household income was obviously insufficient to meet their needs. Petitioners have requested a partial payment installment agreement; the premise of this requested relief is that their assets and nontrust income are inadequate to pay their tax debts and also leave a sufficient amount to pay their necessary expenses. Consequently, petitioners' case presents no genuine dispute as to what would happen under Texas law if Mrs. Melasky had other income or assets available to pay her expenses.

In determining petitioners' ability to pay, the SO properly considered what effect the installment agreement, if accepted, would have on their ability to pay. If in fact the parties had agreed to an installment agreement that required petitioners to pay $5,537 per month (as the corrected calculations indicate), then in the absence of distributions from the Farkas trust petitioners would have been unable to pay $4,708 of their household expenses (i.e., the amount the SO calculated as Mrs. Melasky's share of nontax expenses).[28] Consequently, Mrs. Melasky would

_____

[28]More specifically, petitioners agree that they have $9,580 in monthly income. If we assume for purposes of this discussion a monthly payment of

(continued...)

be without other means to pay her share of expenses and would therefore be permitted, under the trust's plain terms, to take trust distributions to cover them.[29]

In any event, even if petitioners had other means to pay their expenses, the Farkas will does not restrict Mrs. Melasky's discretion in any relevant way. The will provides that the trustee may consider "all circumstances and factors the [t]rustee deems pertinent", including:

> (i) the beneficiaries' accustomed standard of living and station in life; (ii) all other income and resources reasonably available to the beneficiaries and the advisability of supplementing their income or resources; (iii) the beneficiaries' respective character and habits, their

---

[28](...continued) $5,537 under an installment agreement, petitioners would have $4,043 in monthly wage or business income remaining with which to pay their necessary expenses. The parties agree that petitioners had $8,751 in necessary expenses. Petitioners would therefore be unable to pay $4,708 of those expenses out of their wage and business income.

[29]Petitioners seem to suggest that on these facts the sequence of events for purposes of determining whether a taxpayer would be able to pay necessary expenses is: (1) receipt of wage and business income, (2) receipt of trust income, (3) payment of monthly payment amount, and then (4) payment of necessary expenses. Petitioners seem to contend that because, under this sequence of events, they would have more wage and business income than necessary expenses as of the time of the hypothetical trust distribution, Mrs. Melasky would be unable to distribute any trust income to herself. But distributions from the trust could be made at any time, meaning that the way that the SO ordered his analysis provided a more accurate forecast of what would occur: (1) receipt of wage and business income, (2) payment of the monthly payment amount under an installment agreement, (3) receipt of trust income, and then (4) payment of necessary expenses.

diligence, progress and aptitudes in acquiring an education, and their ability to handle money usefully and prudently, and to assume the responsibilities of adult life and self-support in light of their particular abilities and disabilities; and (iv) the tax consequences of the [t]rustee's decision to make (or not to make) the distributions and out of which trust any distributions should be made. * * *

But while Mrs. Melasky may consider these factors, this provision does not restrict her discretion solely to circumstances in which petitioners' assets and income are insufficient to pay Mrs. Melasky's expenses. The will does contain the following restriction:

> The Trustee shall not allow a beneficiary who reasonably should be expected to assist in securing his or her own economic support to become so financially dependent upon distributions from any trust that he or she loses an incentive to become productive in a manner that is reasonably commensurate with any other individual having the ability and being in the circumstances of the beneficiary. * * *

But this restriction would not limit Mrs. Melasky under the circumstances presented because if the parties had agreed to a $5,537 monthly payment amount, the Melaskys would have had to maintain their income-producing activities to pay it. In short, there is nothing in the Farkas will to support a conclusion that Mrs. Melasky would not be permitted to make distributions to cover her share of nontax expenses, even if she had other resources available to pay such expenses.[30]

_____

[30]This conclusion is consistent with Mrs. Melasky's previous action as trustee: Petitioners' February 9, 2012, letter to the SO indicates that during the

(continued...)

Petitioners also contend that the SO's determination in this regard fails to give due consideration to the fact that the Farkas trust is a spendthrift trust. They assert that the SO's determination is equivalent to an impermissible invasion or confiscation of the trust corpus. We disagree. Respondent has not attempted to seize the trust assets, nor does he seek to force distributions. The SO's determination merely accounted for events which were likely to occur if the proposed installment agreement had become a reality. In deciding whether to agree to an installment agreement, the Commissioner determines a taxpayer's ability to pay over the duration of the proposed agreement on the basis of the taxpayer's current financial situation and taking into account all relevant facts and circumstances, including the effect of the installment agreement itself. The SO's determination in this regard was necessarily a forecast. In making his forecast, the SO was not required to turn a blind eye to assets or income likely to be available to petitioners, nor was his forecast of trust distributions for purposes of calculating petitioners' ability to pay in any way equivalent to invading or confiscating the trust corpus.

---

[30](...continued)
administrative process Mrs. Melasky took distributions from the trust to pay certain expenses even though there is no dispute that petitioners had positive net income and other assets available at that time.

Petitioners also argue that it would be a violation of Mrs. Melasky's fiduciary duties for her to exhaust the trust because that would leave nothing for the secondary beneficiaries, and that it was therefore inappropriate for the SO to forecast that Mrs. Melasky could draw on the Farkas trust until it was exhausted. Petitioners' premise is clearly incorrect. The Farkas will explicitly provides that the trustee of the Farkas trust "may distribute" to Mrs. Melasky "so much or all of the income and principal" of the Farkas trust "even though exhausting the trust". And the Farkas will provides that "as to any trust with more than one beneficiary, the Trustee may make discretionary distributions in equal or unequal proportions and to the exclusion of any beneficiary" (emphasis added), i.e., the Farkas will specifically allows Mrs. Melasky to leave nothing for her children. There is no provision in the Farkas will obligating Mrs. Melasky to refrain from distributing the entire corpus to herself to provide for her health, maintenance, support, and education.

For these reasons, we conclude that there was no abuse of discretion in the SO's determination that Mrs. Melasky would be able to take distributions from the Farkas trust to pay her share of petitioners' nontax necessary expenses.[31]

---

[31]The dissent does not object to this conclusion but contends that we have used the wrong analysis in reaching it. The dissent argues that the trust instrument
(continued...)

C. <u>Amount of Trust Distributions</u>

Petitioners argue that the SO erred in attributing 68% of petitioners' nontax necessary expenses to Mrs. Melasky for purposes of forecasting trust distributions. They argue that as a matter of Texas community property law, expenses are divided equally between spouses. We need not and do not decide this issue. The result is ultimately the same regardless of which party is correct. If petitioners are correct, the amount they could pay would still have been significantly more than the maximum $1,017 monthly payment that they offered.[32]  Consequently, we

_____

[31](...continued)
is ambiguous and that its interpretation would therefore require consideration of parol evidence. As we have explained, the trust instrument is not ambiguous in any relevant respect. Consequently, we conclude that this case presents a pure legal issue with respect to interpreting the trust, which makes it unnecessary for us even to consider the dissent's analysis.

In any event, even if the trust instrument were ambiguous, petitioners presented no parol evidence for the SO's consideration during the CDP hearing to support their interpretation. It is not an abuse of discretion for the SO to sustain a proposed collection action on the basis of the record before him. E.g., Giamelli v. Commissioner, 129 T.C. 107 (2007). Accordingly, the SO would not have abused his discretion in rejecting petitioners' unsupported interpretation of the allegedly ambiguous trust document.

The dissent suggests that we have departed from the administrative record in some way. We do not understand how we have done so; we have merely analyzed the Farkas will (which is in the record) but have not looked to parol evidence (which is not in the record).

[32]Under petitioners' view, the nontax household expenses attributable to Mrs. Melasky would have been $3,462 ($8,751 (monthly expenses) – $1,828

(continued...)

would still conclude that the SO did not abuse his discretion in rejecting petitioners' proposed installment agreement.

III. Conclusion

Upon careful review of the record, we conclude that the SO verified that the requirements of any applicable law or administrative procedure have been met, addressed all issues petitioners raised, and balanced the efficient collection of taxes with the intrusiveness of the proposed collection action. We find no abuse of discretion in any respect.

An order and decision will be

entered for respondent.

Reviewed by the Court.

GALE, GUSTAFSON, PARIS, KERRIGAN, LAUBER, NEGA, PUGH, and ASHFORD, JJ., agree with this opinion of the Court.

FOLEY, CJ., did not participate in the consideration of this opinion.

---

[32](...continued)
(current taxes) = $6,923 (petitioners' monthly nontax expenses); $6,923 × 0.5 = $3,462). Under this methodology, $3,462 would have been available every month to Mrs. Melasky from the trust. Adding this amount to the $829 that the SO determined petitioners would have been able to pay in the absence of any trust distribution (after correcting for the SO's math error), petitioners' recalculated ability to pay would be $4,291--significantly more than the $1,017 that they offered.

LAUBER, J., concurring: I agree with the opinion of the Court and write briefly in response to the dissent. Many things said there would justify lengthy rebuttal, had we but world enough and time. I will focus on the treatment of the "bounced check" issue.

On Monday, January 31, 2011, the IRS issued a notice of levy to petitioners' bank in an effort to collect a portion of their outstanding tax liabilities for 1995, 1996, 1999, 2000, 2001, 2002, 2003, and 2004. Their bank account had a balance of $21,182. The $18,000 check petitioners had tendered to the IRS the previous Thursday had not yet cleared their account. Given the intervening weekend, that is not surprising. The bank immediately froze the account and eventually paid over to the IRS as levy proceeds the $21,182 balance. When the $18,000 check was later presented to the bank for payment, there were no funds left in the account, so the check was dishonored.

Because the check was dishonored, the IRS reversed the $18,000 credit it had made to petitioners' 2009 account. Consistently with its normal practice, the IRS applied the $21,182 of levy proceeds as a credit to petitioners' 1995 account, the oldest year showing a balance due. In their CDP hearing request, petitioners asked that the levy proceeds be transferred to their 2009 account. The settlement

officer (SO) declined that request. His reason for doing so, as stated in the notice of determination, was as follows:

> IRS records reflect the $18,000 payment was applied to the 2009 tax year but was reversed when the check was returned due to insufficient funds. * * *. Levy proceeds of $21,182.01 were applied to the 1995 tax year. The levy proceeds are considered an involuntary payment and therefore can be applied by the IRS in the best interest of the government. The taxpayers' request to transfer the levy proceeds to the 2009 tax year is denied.

Our dissenting colleague agrees that we must review the SO's action by applying an abuse-of-discretion standard of review. He asserts that the SO abused his discretion because he erred "as a matter of law." See dissenting op. p. 80. That supposed error was the SO's failure to divine a new rule of law that the dissent would create out of whole cloth, specifically designed to suit the peculiar facts of this case. See id. p. 100 (faulting the SO for "failing to follow a legal rule that I would recognize for the first time").

According to the dissent, the SO committed legal error because he neglected to appreciate that petitioners' $18,000 check actually constituted a "payment" on January 27, 2011, even though that check was later dishonored by their bank. The dissent acknowledges the general rule that tendering a check to the IRS does not constitute a "payment" if the check is dishonored. See id. p. 73. But strict constructionist that he is, our dissenting colleague peers through the mist and

perceives "a background principle of law that creates an exception to the exception to the general rule." See id. p. 76.

And what is that exception? It appears to be an equitable principle derived from contract law: "Common law generally prohibits one party to a contract from interfering with the other party's performance." See id. p. 78. Applying that principle here, the dissent says that the IRS, by levying on petitioners' bank account, interfered with their "performance," viz., their attempt to pay their 2009 tax.

In support of this theory the dissent cites no provision of the Internal Revenue Code. Nor does he cite any regulations, IRS ruling, or judicial opinion in a Federal income tax case. Rather, he cites judicial opinions interpreting Minnesota, Texas, and North Dakota contract law. For several reasons, I find this citation of authority underwhelming.

First, as the dissent acknowledges, there was no contract between the Commissioner and the Melaskys. See id. p. 79. Petitioners are debtors; the IRS is a creditor. There was no bargained-for exchange or tender of consideration that could be thought to give rise to a contract. There being no contract, I do not see what relevance State contract law has in deciding the proper application of the $18,000 payment for Federal income tax purposes.

Second, if there were thought to be a contract between the Commissioner and the Melaskys regarding payment of their tax liabilities, it would seem to me that they breached that contract years ago. They have not been in compliance with their Federal tax obligations since (at least) 1995. That being so, it is hard to see what standing they would have to urge that the IRS had interfered with their performance of the contract.

Third, even if State contract law were thought relevant, our dissenting colleague has not shown that the contract principle he invokes would apply here. In the three cases he cites, the contract principle enunciated is that a party may not breach his duty of good faith and fair dealing by unjustifiably hindering the other party's performance.[1] This is how the rule is stated under contract law more generally, requiring wrongful, purposeful, and intentional interference.[2]

---

[1]See Cox v. Mortg. Elec. Registration Sys., Inc., 685 F.3d 663, 671 (8th Cir. 2012) (holding that the plaintiff had not sufficiently pleaded the defendant's breach of its "duty of good faith and fair dealing by unjustified hindrance" of contract performance); In re Econ. Lodging Sys., Inc., 226 B.R. 840, 844 (Bankr. N.D. Ohio 1998) (stating that a breach of contract may occur where "one party to a contract wrongfully prevents the other party's performance"), aff'd, 234 B.R. 691 (B.A.P. 6th Cir. 1999); Barrett v. Gilbertson, 827 N.W.2d 831, 840 (N.D. 2013) (holding that a contractor was excused from performance when homeowners refused to allow him onto the premises to repair alleged defects in the home's construction).

[2]See. e.g., Kader v. Paper Software, Inc., 111 F.3d 337, 342 (2d Cir. 1997)
(continued...)

The dissent makes no effort to show that this principle could possibly apply on our facts. There is no suggestion that IRS personnel wrongfully or purposefully prevented petitioners' $18,000 check from clearing. The Melaskys apparently delivered the check by walking into an IRS office in Houston, Texas, on a Thursday. The notice of levy was issued to their bank, apparently by the IRS Philadelphia service center, on the following Monday.

This case was presented on cross-motions for summary judgment. Petitioners presented no evidence, and there is no plausible basis for inferring, that IRS officials in Houston "sat on" the check for tactical reasons. There is no evidence that the Philadelphia service center, when issuing the notice of levy, was aware that petitioners had tendered this check. As far the record shows, it was a pure coincidence that the notice of levy was issued four days later. There is simply no evidence to support the proposition that IRS officials wrongfully breached any

---

[2](...continued)
("The covenant of good faith and fair dealing, implied in every contract under New York law, 'includes an implied undertaking on the part of each party that he will not intentionally and purposefully do anything to prevent the other party from carrying out the agreement on his part.'") (quoting Carvel Corp. v. Diversified Mgmt. Grp., Inc., 930 F.2d 228, 230 (2d Cir. 1991))).

duty of good faith and fair dealing by interfering with the Melaskys'

"performance."[3]

Regardless of what one thinks about the "exception to the exception to the

general rule" that the dissent fashions, the SO did not commit an error of law or

abuse his discretion in any other way.  The law is clear in collection due process

cases that an SO does not abuse his discretion when he relies on accurate infor-

mation appearing on the taxpayer's account transcripts and applies valid IRS rules

and procedures.  See Craig v. Commissioner, 119 T.C. 252, 262 (2002); May v.

Commissioner, T.C. Memo. 2014-194, 108 T.C. (CCH) 324, 326, aff'd sub nom.

Best v. Commissioner, 102 F. App'x 615 (9th Cir. 2017); Vines v. Commissioner,

T.C. Memo. 2006-258, 92 T.C.M. (CCH) 460, 463; Zapata v. Commissioner, T.C.

Dkt. No. 28931-09 L, 2016 WL 9582709 (Aug. 5, 2016) (Holmes, J.) (holding that

an SO properly applied a valid revenue procedure to the record before her and thus

did not abuse her discretion).

Petitioners' account transcripts showed that the $18,000 credit to their 2009

account had been reversed because the bank dishonored their check.  That in-

---

[3]This case bears no resemblance to Parrish v. United States, 2 A.F.T.R.2d (RIA) 5656 (W.D. Mo. 1958), cited infra dissenting op. p. 76.  The taxpayer's check in that case was treated as a payment where the IRS received the check and then lost it.  This case differs from that one in two respects:  Here there is no evidence of IRS negligence, and there the check was not dishonored by the bank.

formation was correct. The IRS had received levy proceeds of $21,182 and had applied those proceeds to 1995. That information was also correct. A revenue procedure and related guidance instruct IRS officers to apply levy proceeds "to periods in the order of priority that the Service determines will serve its best interest." Rev. Proc. 2002-26, sec. 3.02, 2002-1 C.B. 746, 746. Generally, the Government's best interest will be served by applying levy proceeds "to the oldest tax, oldest penalty, and oldest interest, in that order until fully used." Chief Counsel Advice 201341034 (Oct. 11, 2013). Consistent with this guidance, the SO determined that the IRS had properly applied the levy proceeds to petitioners' 1995 tax year. On the basis of IRS procedures and the information before him, the SO plainly did not abuse his discretion in declining petitioners' request "to transfer the levy proceeds to the 2009 tax year."

Petitioners did not advance, in their presentations to the SO, the legal theory enunciated by the dissent. The only time petitioners addressed the relevance of the $18,000 check was in the statement attached to their Form 12153 request for a CDP hearing. There they stated their belief "that the statute of limitations on collection may have expired with respect to the taxable years 1995 and 1996." Petitioners recited the facts about tendering the $18,000 check, designating that check to their 2009 tax liability, and the ensuing levy on their bank account. Their legal

argument consisted of the following: "Unfortunately, the IRS had not cashed Taxpayers' $18,000.00 check by the time of the levy. Taxpayers request that the IRS apply the levy proceeds to the Form 1040 for 2009."

There were numerous subsequent communications between the SO and petitioners' counsel (the administrative file is 600+ pages long). But all of those communications concerned petitioners' request for a collection alternative in the form of an installment agreement. There was no subsequent reference to the $18,000 check, apart from the SO's discussion of this point in the notice of determination.

From the statement attached to their Form 12153, it appeared that petitioners were advancing one of two contentions: (1) that the IRS' application of the $18,000 payment to 1995 was erroneous because the period of limitations on collection had expired for that year or (2) that the IRS, as a matter of equity, should transfer the levy proceeds to their 2009 account. The SO did not abuse his discretion in rejecting those two contentions. The first contention was factually incorrect because the period of limitations for 1995 had not expired. And petitioners supplied no legal basis for their request that the SO apply the levy proceeds to 2009. As the SO explained, that payment was involuntary, and the IRS was fully justified in applying it to 1995, the oldest open year showing a tax liability.

Petitioners did not advance, at any point during the CDP proceeding, the legal theory that the dissent announces--that the $18,000 check, despite being dishonored by petitioners' bank, was nevertheless a "payment" that the IRS was required to apply to their 2009 tax year. Petitioners did not contend that the $18,000 check was a "payment" that the IRS was required to apply to 2009. Rather, they made a "request [that] the IRS apply the levy proceeds," i.e., $21,182, from 1995 to 2009. The SO did not commit legal error by failing to address an argument petitioners did not make.

The dissent invokes the Chenery doctrine, but the invocation of that doctrine seems a bit ironic here. See dissenting op. p. 61 (citing SEC v. Chenery Corp., 332 U.S. 194 (1947)). The Chenery doctrine teaches that an administrative agency must set forth the grounds on which it relied when making its decision, with no "post hoc rationalizations" allowed. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962) (citing Chenery Corp., 332 U.S. at 196). The SO clearly did set forth the grounds on which he relied: (1) petitioners' $18,000 payment was properly reversed when their bank dishonored their check and (2) the $21,182 of levy proceeds represented an "involuntary payment" that the IRS was free to apply as it saw fit. As the Court ably shows, the SO was correct on both counts.

It is our dissenting colleague who propounds the "post hoc rationalization" here. He advances an argument that petitioners never made during the CDP hearing. And he supports that argument with no plausible legal authority whatsoever. His assertion that the SO abused his discretion in failing to apprehend and accept an unprecedented legal argument that petitioners did not make is administrative law run amok.

In this case the IRS used a statutorily authorized collection method that happened to reach petitioners' bank before their check did. Under longstanding IRS practice, the levy proceeds constituted an involuntary payment that the IRS was free to apply as it saw fit. The SO did not abuse his discretion in so concluding. In concluding otherwise, the dissent would create an ill-founded equitable exception ginned up to suit the peculiar facts of this case. This is an exercise in what Justice Scalia might have described as "interpretive jiggery-pokery," King v. Burwell, 576 U.S. __, __, 135 S. Ct. 2480, 2500 (2015) (Scalia, J., dissenting), and

would be ill advised in any Tax Court opinion.  It would be particularly inappro-

priate in a CDP case where we are reviewing agency action for abuse of

discretion.[4]

THORNTON, MARVEL, GUSTAFSON, KERRIGAN, BUCH, NEGA, PUGH, and ASHFORD, JJ., agree with this concurring opinion.

---

[4]The dissent wholly mischaracterizes the opinion of the Court by asserting that the "rule of law" it adopts is that a check tendered to the IRS "doesn't count if the taxpayer involved is really, really bad." See dissenting op. p. 67.  This assertion is so out of line that one is inclined to let it twist in the wind.  But at the risk of dignifying it with a response, I will offer a brief one.  The Court's analysis of the "bounced check" issue is based on two established legal propositions:  (1) a check tendered by a taxpayer does not constitute a "payment" if the check is dishonored and (2) the IRS may apply levy proceeds as determined to be in its best interest.  Evaluation of the taxpayer's character has nothing to do with this.  The fact that the Melaskys had been delinquent in their tax obligations is notable only in assessing what might be thought the equities of the case.  Since the Melaskys had been subject to previous IRS collection action and had numerous open tax years, they were aware of the risk that their bank account might be levied upon at any time.  Had they wanted to ensure that their $18,000 payment would be applied as they wished, they could have tendered to the IRS (for example) a cashier's check.  They did not, and they thus assumed the risk that materialized.  Even if this case were decided on the loosey-goosey equitable turf that the dissent proposes, it is not clear to me that the Melaskys should win.  But our decision must be based on the law, and the Court's analysis of the legal issues would be exactly the same regardless of the taxpayers' compliance history.

BUCH and PUGH, JJ., concurring:  We agree with the result as applied to the facts of this case and write separately to emphasize what we understand to be the limited scope of the opinion of the Court.

The material facts can be summarized very briefly.  The Melaskys had long-outstanding liabilities for which they received multiple notices of intent to levy and for which they entered into and defaulted on multiple installment agreements.  The Melaskys hand-delivered a check to the Commissioner on January 27, 2011, a Thursday.  When tendering that check, the Melaskys requested that it be applied against their 2009 liability.  The IRS issued a notice of levy to the Melaskys' bank two business days later, on Monday, January 31, 2011.  The Commissioner applied the levy proceeds against the oldest outstanding liability, which was from 1995.  When the Commissioner later attempted to process the check, it bounced.

The levy occurred very shortly after the check had been tendered, which meant that the check was dishonored.  By choosing to tender a personal check rather than a certified check or money order, the Melaskys ran this risk; ever since they had gotten the notice of intent to levy (and then defaulted on installments), they had run the risk that the IRS would levy on their accounts and any of their checks would bounce.  There is no evidence that the Commissioner unduly delayed in processing the check or that the Commissioner acted in a manner so as

to purposefully avoid petitioners' designation of payment. Such action (or

inaction, as the case may be) might be viewed as running afoul of Rev. Proc.

2002-26, sec. 3.01, 2002-1 C.B. 746, 746, which <u>requires</u> the Commissioner to

apply a payment as designated:

> If additional taxes, penalty, and interest for one or more taxable periods have been assessed against a taxpayer (or have been mutually agreed to as to the amount and liability but are unassessed) at the time the taxpayer voluntarily tenders a partial payment that is accepted by the Service and the taxpayer provides specific written directions as to the application of the payment, the Service will apply the payment in accordance with those directions.

We do not read the opinion of the Court to foreclose finding an abuse of discretion

if evidence were to show that, through negligence or malfeasance, the

Commissioner circumvented his own revenue procedure for designating payments.

This case, however, does not present those facts.

GUSTAFSON and PARIS, <u>JJ</u>., agree with this concurring opinion.

HOLMES, J., dissenting:  It is the Melaskys' singular misfortune to have a case that raises four unresolved questions, any one of which would have merited a reviewed opinion.[1]  But the Court has concluded that they are really, *really* bad taxpayers and, in today's Opinion, we again swim against the mainstream of administrative law to try to make sure that the best arguments in support of the Melaskys' position--indeed, the best articulation of what exactly those issues are-- sink without a trace.  Until today, we have consistently agreed that we can uphold an SO's determination in a CDP case only on the grounds he actually relied on when making his determination.  See Antioco v. Commissioner, T.C. Memo.

---

[1] There may even be a fifth.  The Commissioner assessed a penalty against the Melaskys under section 6657 for tendering the check the IRS made bounce. This prompts the question of whether the settlement officer (SO) met the verification requirement of section 6330(c)(1) in upholding the assessment of that penalty.  See Hoyle v. Commissioner, 131 T.C. 197, 202-03 (2008) ("[T]his Court will review the Appeals officer's verification under section 6330(c)(1) without regard to whether the taxpayer raised it at the Appeals hearing"), supplemented by 136 T.C. 463 (2011).  The bad-check penalty is presumably a penalty to which the supervisory-approval requirement of section 6751(b)(1) applies--it's not an addition to tax under section 6651, 6654, or 6655, and there's no indication that it's automatically calculated through electronic means--but there's no evidence in the administrative record that the SO verified that the Commissioner complied with section 6751(b)(1) when he assessed the bad-check penalty against the Melaskys.  Cf. Blackburn v. Commissioner, 150 T.C. __, __ (slip op. at 9-10) (Apr. 5, 2018).  The Melaskys, however, didn't assign error to this potential problem with verification, which means it might be conceded.  See Tax Court Rule 331(b)(4); Lloyd v. Commissioner, T.C. Memo. 2017-60, at *7 n.3; Dinino v. Commissioner, T.C. Memo. 2009-284, 2009 WL 4723652, at *7.  We leave this question unanswered today.

2013-35, at \*24-\*25; <u>Jones v. Commissioner</u>, T.C. Memo. 2012-274, at \*22-\*23; <u>Salahuddin v. Commissioner</u>, T.C. Memo. 2012-141, 2012 WL 1758628, at \*7. We likewise held in a recent reviewed opinion that we would follow the same rule in whistleblower cases.  <u>See</u> <u>Kasper v. Commissioner</u>, 150 T.C. __, __ (slip op. at 24-25) (Jan. 9, 2018).

This is the unexceptionable <u>Chenery</u> rule:  The administrative-law principle that says "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."  <u>SEC v. Chenery Corp.</u> (<u>Chenery II</u>), 332 U.S. 194, 196 (1947) (describing its holding in <u>SEC v. Chenery Corp.</u> (<u>Chenery I</u>), 318 U.S. 80 (1943)).  This means that the SO must clearly set forth the grounds on which he made his determination, so that we don't have to guess.  <u>See</u> <u>id.</u> at 196-97.  We should not uphold the notice of determination "simply because findings might have been made and considerations might be disclosed which might justify his ultimate conclusion."  <u>Antioco</u>, at \*25 (citing <u>Chenery I</u>, 318 U.S. at 93-94).

But that's what we do with three of the four questions we answer today:[2]

---

[2] The reference in the opinion of the Court to <u>Chenery II</u>, <u>see</u> op. Ct. p. 22, reads like an afterthought.  It also cites <u>Bowman Transp., Inc. v. Arkansas-Best</u>

(continued...)

- Can the IRS make a voluntary payment into an involuntary payment by making the check bounce?

- Can an SO ignore internal IRS guidance in requiring the liquidation of even illiquid assets before considering a collection alternative?

- How should a nonlawyer SO decide complicated questions of Texas testamentary law in calculating how much the Melaskys could pay?

For each of these questions, I review first what the SO actually did, then how we go about justifying his answers in ways that he didn't, and then what I think the right result should be.

## I.

## A.

I begin with the check that the IRS made bounce. The administrative record shows that on January 27, 2011, the Melaskys walked into an IRS office with a check for $18,000. They asked to apply it against their 2009 tax liability. It would've paid their whole liability for that year.[3] The IRS admits that it got this

_____

[2](...continued)
Freight Sys., Inc., 419 U.S. 281, 286 (1974), for the Chenery modifier that an agency's "decision of less than ideal clarity" will be upheld "if the agency's path may reasonably be discerned." See op. Ct. p. 22. But there's nothing else in the opinion of the Court that shows it actually relied on these fundamental administrative-law principles. It instead provides its own reasons to uphold the SO's determination that had little to do with the explanation provided by the SO.

[3] The majority says that the Melaskys owed slightly more than $18,000

(continued...)

check.  IRS records show that it posted the $18,000 payment to the Melaskys'

2009 account on that same day.  These records then show a reversal of that same

amount because the check bounced.  Why did it bounce?  Here we have an

unusual, but undisputed, fact--on January 31, the IRS sent a notice of levy to the

Melaskys' bank.  This notice froze their entire balance and, when the IRS executed

the levy sometime after January 31, made the Melaskys' check bounce.  The IRS

then applied the entire balance that it got with the levy against the Melaskys' 1995

---

[3](...continued)
when they tendered their check, see op. Ct. p. 6, which I guess (because it doesn't
say) the majority determined from the notice of intent to levy (NIL) in the
administrative record.  The NIL is dated January 31, 2011--only four days after the
Melaskys tendered their check--and it does show a 2009 balance of $18,423.97.
But one can't stop there:  The NIL also has a pay-by date of February 24, 2011,
and the 2009 balance is the amount that would be due as of that date, not the date
of the notice.  See Internal Revenue Manual (IRM) pt. 5.11.1.2.2 (Dec. 11, 2009).
According to the NIL, on the February 24, 2011 pay-by date the Melaskys would
have had an assessed balance of $17,760.60, accrued interest of $170.62, and
accrued late-payment penalty of $492.75.  Those numbers include a month's worth
of interest and an additional 0.5% late-payment penalty that would've accrued on
the Melaskys' account between January 27 and February 24, 2011.  See sec.
6651(a)(2); sec. 301.6651-1(a)(2), Proced. & Admin. Regs.  If there was a
difference between the amount the Melaskys paid and the amount they owed, it
was slight indeed.  In their cross-motion for summary judgment the Melaskys
asserted that their $18,000 check would've fully paid their liability--an assertion
that the Commissioner didn't dispute.  (And we do note that this arithmetic
problem doesn't change the result or reasoning of any of the opinions released
today.)

tax liability on February 28. To add injury to this injury, the IRS also charged the Melaskys $360 as a penalty for writing a bad check.[4]

The relevant section of the Code is 6311(b), which provides that if a check "is not duly paid, or is paid and subsequently charged back to the Secretary, the person by whom such check * * * has been tendered shall remain liable for the payment of the tax * * * to the same extent as if such check * * * had not been tendered." This section governs the classic case of a check returned because of insufficient funds, but does it govern here? Look at it from the Melaskys' perspective--they had more than $20,000 in the account on which they drew the check. The check was for $18,000. The IRS got $18,000 from that very account. How can one say that the check was not "duly paid"?

Here's the complete "analysis" in the notice of determination: "The levy proceeds are considered an involuntary payment and therefore can be applied by the IRS in the best interest of the government. The taxpayer's request to transfer the levy proceeds to the 2009 tax year is denied." No mention of section 6311; no

---

[4] Section 6657 gives the IRS the power to impose a penalty of 2% of the amount of the check, unless it's less than $1,250, in which case the penalty is $25 (or the amount of the check if it's for less than $25). I note without comment that section 6657 also states: "This section shall not apply if the person tendered such instrument in good faith and with reasonable cause to believe that it would be duly paid."

discussion of what the phrase "duly paid" means in this context. This is, in short, a classic example of an agency's begging the relevant question. See, e.g., Puerto Rico Higher Educ. Assistance Corp. v. Riley, 10 F.3d 847, 853 (D.C. Cir. 1993) (remand where agency "failed to explicate both its interpretation of the [relevant] statute and its reasons for excluding from consideration many of the factors" raised by other party); Philadelphia Gas Works v. FERC, 989 F.2d 1246, 1250-51 (D.C. Cir. 1993) (remand where agency gave inadequate explanation for its conclusions, "leav[ing] regulated parties and a reviewing court completely in the dark as to the core of * * * [its] reasoning and its relationship to past precedent"); Carolina Power & Light Co. v. FERC, 716 F.2d 52, 55-56 (D.C. Cir. 1983) (remand where agency dismissed "[i]n conclusory language," or completely failed to mention, the other party's arguments, making it "difficult, if not impossible, for * * * [the] court to intelligently perform its assigned reviewing function and to discern the path taken by an agency in reaching its decision").[5] Such an inadequate explanation of its reasoning is why we should remand this case to IRS Appeals after instructing it on the proper construction of that section. See 5

---

[5] Because the Melaskys filed their Tax Court petition before December 18, 2015--the effective date of section 7482(b)(1)(G)--it's likely the appropriate appellate venue for this case is the D.C. Circuit. See Byers v. Commissioner, 740 F.3d 668, 675-77 (D.C. Cir. 2014), aff'g T.C. Memo. 2012-27.

U.S.C. sec. 706 ("reviewing court shall decide all relevant questions of law,

interpret constitutional and statutory provisions, and determine the meaning or

applicability of the terms of an agency action").

## B.

This should also be a situation where we apply Chenery. But instead of

examining the SO's reasoning--or, more precisely, lack of reasoning--we create

today a new rule of law. This isn't a construction of the phrase "duly paid"--the

majority *also* fails to engage in a discussion of what that phrase means and is even

unwilling to accept the simple statement that the IRS caused the Melaskys' check

to bounce.[6] Instead, we are told: "Respondent did not cause petitioners' check to

bounce; petitioners' check bounced because they owed and have chronically failed

---

[6] Instead of engaging in its own statutory construction of the phrase "duly paid"--or, indeed, even acknowledging the relevant statute exists--the opinion of the Court mischaracterizes my statutory construction of that undefined phrase as an "equitable exception." See op. Ct. p. 28. Judge Lauber in his concurrence also ignores the relevant statute and engages in no statutory construction, but claims that I've relied on some "equitable principle" rather than a reasoned analysis of the meaning of "duly paid." See Lauber op. p. 49. He calls me a "strict constructionist," see id. p. 48, and I can't disagree. But we textualists do "pay attention to the glosses often put on language (even in ordinary usage), the specialized connotations of established terms of art, and the background conventions that sometimes tell readers how to fill in the gaps inevitably left in statutory directions." John F. Manning, "Textualism and the Equity of the Statute," 101 Colum. L. Rev. 1, 109 (2001). I've found a background principle that fills the gap here for an undefined term in the relevant statute--a statute the majority doesn't even bother citing.

to pay various taxes, a portion of which was collected by levy after respondent's many attempts at compromise failed to reach a voluntary resolution." See op. Ct. pp. 28-29.[7]

To a reasonably intelligent speaker of English, "causing a check to bounce" means writing a check that isn't honored because the account either doesn't exist or contains insufficient funds. See Black's Law Dictionary 287 (10th ed. 2014). It does not, or at least not necessarily, include the payee's taking money from the account in a different way and *then* presenting the check. It certainly doesn't include any notion of failing, much less "chronically failing," to pay income tax. Or maybe "various" taxes. Or maybe only after "many attempts at compromise failed to reach a voluntary resolution."

The rule of law we identify and apply today is that a voluntary payment, even if it precedes a payment by levy, doesn't count if the taxpayer involved is really, *really* bad. Maybe a taxpayer who was really bad, but not really, *really* bad--perhaps one who defaulted on only one installment agreement, or one who

_____

[7] Judges Buch and Pugh recognize in their concurrence that there's something missing in the majority Opinion, but they, too, fail to properly apply Chenery. They might find that the SO abused his discretion if there was evidence that the Commissioner was negligent or malfeasant in cashing the check, see Buch & Pugh op. p. 59, but the record shows that the SO didn't even consider that possibility. How can we determine whether the SO was right about something he failed to consider?

had a 10-year-old tax debt instead of a 16-year-old tax debt--might be able to argue that the IRS caused his check to bounce.[8] Or if a taxpayer tendered a check one month, six months, or a year before the payment by levy, perhaps he could then argue that the IRS caused his check to bounce because it certainly should've cashed it by then. But that's not the Melaskys--nope, they were really, *really* bad taxpayers, and the majority fails to set any restrictions on how long the IRS has to cash a check before levying on the same account. So we blame the bouncing on them and don't even have to think about who caused their check to bounce and what consequences that might have on how to apply the relevant section of the Code.

## C.

This turns out to be a genuinely difficult question of law. If the Melaskys are right that there shouldn't be any unpaid liability for 2009, then our job is easy. The SO would surely have abused his discretion in upholding a levy to collect tax that was already paid. The question of whether it was already paid turns on whether the payment was voluntary or involuntary. The parties agree that the

---

[8] Or maybe not. The majority also asserts that "in any event respondent had no legal obligation to ensure that petitioners' check was deposited before the levy occurred." See op. Ct. p. 28. In which case, even saintly taxpayers are going to have a problem in the future when the IRS is grossly dilatory in depositing checks unless Judges Buch and Pugh's views prevail.

Commissioner is free to apply payments that are involuntary against whatever outstanding tax liability he wishes, see Amos v. Commissioner, 47 T.C. 65, 69 (1966), and also agree that taxpayers are free to apply payments that are voluntary against whatever outstanding tax liability they wish, see Wood v. United States, 808 F.2d 411, 416 (5th Cir. 1987). The parties also don't dispute the timeline--the Melaskys hand delivered a check on January 27, 2011, and directed it be applied to pay off their entire 2009 tax liability.[9] The IRS then sent a notice of levy to their bank on January 31, 2011, before it tried to cash the check in the normal way. The check bounced because the bank froze the account. The IRS got the money in the account, including the money it would have been paid if it had presented the check in the ordinary way, but treated the whole value of the account as an involuntary payment and applied that entire amount against the Melaskys' 1995 tax liability.

---

[9] There are additional procedural requirements to properly designate voluntary payments: A taxpayer must, for example, provide "specific written directions as to the application of the payment" when tendering it. Rev. Proc. 2002-26, sec, 3.01, 2002-1 C.B. 746, 746. The administrative record doesn't include a copy of the $18,000 check or any other evidence of specific written directions. The Commissioner in his brief, however, admitted that the Melaskys directed the payment be for 2009 and the IRS originally applied it to that year. This means that he has waived any objection to the Melaskys' possible failure to attend to these procedural niceties.

Given this timeline, the first question is: when did the IRS "receive" the Melaskys' payment? The Commissioner cites no authority at all to address why chronological order shouldn't apply here. The Code and regulations specifically allow the IRS to accept payment of taxes via check. See sec. 6311(a); sec. 301.6311-1(a)(1), Proced. & Admin. Regs. Neither of these provisions, however, addresses when a payment by check is deemed to be received, with two possible options being the tender date and the clearing date.[10] To help solve this mystery, I would turn to caselaw about similar situations where the date of payment was in issue.

Start with some basics. In Richardson v. Smith, 301 F.2d 305, 306 (3d Cir. 1962), the Third Circuit held that the date of tender was the payment date. The taxpayer there gave the IRS a check on April 1, but the IRS stamped a receipt for it April 10 (the receipt also showed the April 1 date, but less conspicuously). Id. at 305. The taxpayer wanted to file a refund claim, and the claim's timeliness depended on the payment date. See id. The Commissioner himself argued "that the date was April 1, which was the date the check was received." Id. at 306. The court agreed, noting that both the April 1 and April 10 dates showed up on the

---

[10] Credit cards do have a specific regulation governing when payment is deemed received. See sec. 301.6311-2(b), Proced. & Admin. Regs.

receipt, and despite the confusion, the date the Commissioner received the check prevailed. Id.

York v. United States, 636 F. Supp. 544 (N.D. Ga. 1986), dealt with a similar issue. The United States claimed that the taxpayer's lawsuit was filed too late because more than two years had passed since the taxpayer paid the tax. See id. at 545. The IRS received a check from the taxpayer on September 4, 1981, and the taxpayer didn't file a petition until September 13, 1983. Id. The taxpayer argued the petition was nonetheless timely because his bank didn't debit his account until September 14, 1981. Id. The court found for the Commissioner and concluded that "[s]ection 6311 does not specify that the date the check clears is the date of payment. For the purposes of this suit, the court finds that the date on which the IRS received [the taxpayer's] check, at the latest, is the date of payment." Id.[11]

These cases rely on an important assumption--that the check actually clears in the normal course. Does the payment date change in situations where the IRS

[11] This idea even dates back to before the 16th Amendment and the income tax. In reviewing a case about whether Virginia had to accept coupons issued by the state in payment of taxes, the Supreme Court said: "It is well settled by many decisions of this court that, for the purpose of affecting proceedings to enforce the payment of taxes, *a lawful tender of payment is equivalent to actual payment*, either being sufficient to deprive the collecting officer of all authority for further action." Poindexter v. Greenhow, 114 U.S. 270, 281-82 (1885) (emphasis added).

tries to cash the check and it doesn't clear? The answer is yes. In this situation, the longstanding principle has been to ignore the tender date of the dishonored check. Section 6311(b) provides that if a check "is not duly paid, or is paid and subsequently charged back to the Secretary, the person by whom such check * * * has been tendered shall remain liable for the payment of the tax * * * to the same extent as if such check * * * had not been tendered." See also Weber v. Commissioner, 70 T.C. 52, 57 (1978) ("But where the checks were not presented and honored in due course, this Court has held that no payment ever occurred because the condition upon which the conditional payment rested was never satisfied"); Second Nat'l Bank of Saginaw v. United States, 39 F.2d 759, 760 (Ct. Cl. 1930) ("The day on which the collector receives the check will be considered the date of payment so far as the taxpayer is concerned, unless the check is returned dishonored") (quoting regulation); In re Bliss College, 39 A.F.T.R.2d (RIA) 77-1529 (D. Me. 1977) ("The Court concludes that the deposit of [the taxpayer's] check, which was subsequently dishonored, did not constitute payment of [the taxpayer's] tax liability"). This idea certainly makes sense--we won't hold either the taxpayer or the IRS to a payment date if the IRS doesn't actually get the money. Any other conclusion would lead to absurd results, such as allowing taxpayers to avoid late-payment penalties by tendering bad checks by the due date.

So if the general rule is that the date of a payment made by check is the tender date, there's an exception if the check doesn't clear.

The majority does a fine job of iterating and reiterating this general rule and its exception. See op. Ct. pp. 23-27. It cites Estate of Hubbell v. Commissioner, 10 T.C. 1207 (1948), which asked whether a state-income-tax deduction was available on a decedent's final tax return for New York taxes the decedent paid with a check that the bank didn't honor because the check wasn't presented for payment until after his death. We held under the general rule and its exception that the estate couldn't take the deduction on the decedent's final return; we also noted, though, that "taxes [in New York] must be paid in money * * * a tax collector has no authority to accept checks." Id. at 1208. The other T.C. Opinions the majority cites--Estate of Belcher v. Commissioner, 83 T.C. 227 (1984), and Estate of Spiegel v. Commissioner, 12 T.C. 524 (1949)--similarly dealt with the proper time for taking deductions for payments made by check to parties other than the IRS, and used the general rule and its exception to find the answer. The Memorandum Opinion that the majority cites, Vanney Assocs., Inc. v. Commissioner, T.C. Memo. 2014-184, at *6-*7, talks about the general rule and its exception, but its holding is based on a different rule that applied to that case's unusual facts: "[T]he relation-back doctrine is inapplicable where the payee

knows the payor has insufficient funds and therefore refrains from cashing the check." The majority also found a Supreme Court of Texas case--<u>Muldrow v. Texas Frozen Foods, Inc.</u>, 299 S.W.2d 275 (Tex. 1957)--exceedingly persuasive. The majority says: "There would seem to be no reason to treat a Texas check differently for Federal tax purposes from the way the Texas Supreme Court would treat it for State tax purposes."[12] <u>See</u> op. Ct. p. 27. Well, yes there is. <u>Texas Frozen Foods, Inc.</u> turned on an old quirk of Texas law that, "[i]n the absence of a constitutional or statutory provision authorizing payment in some other medium, taxes must always be paid in money." <u>See</u> <u>Texas Frozen Foods, Inc.</u>, 299 S.W.2d at 277 (distinguishing contrary caselaw in "jurisdictions which have statutes authorizing the payment of such obligations by check"); <u>cf.</u> <u>Cantlay & Tanzola, Inc. v. Ingels</u>, 88 P.2d 141, 142 (Cal. Ct. App. 1939) (check for car tax "in effect honored and paid" when backed by sufficient funds at time of tender though bounced at time of presentment).

All of these cases, plus the Texas cases the majority cites, plus my conclusion as to the general rule on payment date fail to account for one specific fact in this case. Unlike the taxpayers in <u>Bliss College</u>, <u>Vanney Assocs., Inc.</u>, and

---

[12] The majority did not consider the "administrative nightmare" that could follow from relying, or even appearing to rely, on state common law to resolve this issue. <u>See, e.g.</u>, <u>Trout v. Commissioner</u>, 131 T.C. 239, 250-51 (2008).

Texas Frozen Foods, Inc., who wrote checks without sufficient funds to cover them at the time they were written, the Melaskys had no reason to think they didn't have sufficient funds to cover their check when they wrote it. The Commissioner did in fact get the money the Melaskys intended for him to get when they delivered their check. It's just that the IRS treated the check as having bounced and characterized the entire amount of money in the account as having been seized by levy. There is no question that the Melaskys' check would not have bounced had the IRS cashed it before the levy. Or, indeed, that the IRS would've respected the Melaskys' voluntary-payment instructions had they paid instead by cashier's check. See, e.g., Rogers v. McDorman, 521 F.3d 381, 383 (5th Cir. 2008) (citing Texas law for proposition that cashier's check is essentially as good as cash).[13] Now I don't find anything that the IRS did blameworthy: Given the size of the IRS, no one would be surprised to learn that the right hand of the IRS not only doesn't know what the left hand of the IRS is doing, but that the left hand even

---

[13] Note, however, that as far back as almost 70 years ago our Court was already concerned about forcing such inconvenient payment methods on taxpayers--methods that "would subject the public to vast inconvenience, and to increased risk even." See Estate of Spiegel, 12 T.C. at 529.

exists.  What doesn't change, however, is that the IRS itself made the check bounce.[14]

So one should ask:  Is there a background principle of law that creates an exception to the exception to the general rule?  I think there is.  In <u>Parrish v. United States</u>, 2 A.F.T.R.2d (RIA) 5656 (W.D. Mo. 1958), the taxpayer mailed a check to the IRS for his 1947 tax liability.  The IRS received the check but lost it.  A few years later the IRS assessed interest against the taxpayer for his 1947 tax liability.  The taxpayer sent in another check under protest.  The court held that the taxpayer paid his tax when he originally mailed in the first check and that he wasn't liable for any interest.  It was the IRS's fault the taxpayer's liability remained unpaid, the court reasoned, and when the error was fixed, the taxpayer was deemed to have paid the tax when he originally sent in the check.  And <u>Cantlay & Tanzola</u>, 88 P.2d at 142, actually held that (at least where there is a statute allowing payment of taxes by check) even a bank's mistake in refusing payment on a check that, when tendered to the government, had sufficient funds to

---

[14] The IRS is but one organization, though Judge Lauber might prefer to treat its different offices as unrelated third parties.  <u>See</u> Lauber op. p. 51 (focusing on fact that the Melaskys tendered their check at a Houston IRS office and the levy was issued days later by a Philadelphia IRS office).

back it is not enough to hold that the tax debt was not paid when tendered--even though, unlike the IRS here, the taxing authority didn't get paid till months later.

I recognize that there's a difference between the IRS's losing a check and the IRS's making it bounce by seizing the account on which it's written--maybe there's some kind of institutional negligence in the former. But in this exceptionally unusual situation we can get some insight by looking outside tax law and seeing what we can find in more general commercial and contract principles. An official comment to Uniform Commercial Code section 2-511 notes that "the taking of a seemingly solvent party's check is commercially normal and proper and, if *due diligence is exercised in collection*, is not to be penalized in any way." (Emphasis added.) The implication is that there must be instances where the manner of cashing lacks due diligence or was unreasonable. Courts have heard claims of unreasonable delay in cashing checks and reached varying results,[15] but it's clear that "[t]he cases recognize that what is a reasonable time depends upon the circumstances of each case." Curran v. Bray Wood Heel Co., 68 A.2d 712, 718 (Vt. 1949). Although the IRS didn't hold the Melaskys' check for long, the

---

[15] Compare Bill Munday Pontiac, Inc. v. Satterwhite, 586 S.W.2d 946 (Tex. Civ. App. 1979) (that creditor held a check for two months before returning it to the debtor did not affect outcome of case), with Willis v. City Nat'l Bank of Galveston, 280 S.W. 270 (Tex. Civ. App. 1925) (finding it unreasonable for the creditor to retain check for more than one year).

record shows that the IRS was about to levy on the Melaskys' bank account when it accepted their check without objection.

Common law generally prohibits one party to a contract from interfering with the other party's performance. Not only does this prohibition excuse the injured party from performing, but it even gives that party an action for breach against the interfering party. See, e.g., Cox v. Mortg. Elec. Registration Sys., Inc., 685 F.3d 663, 671 (8th Cir. 2012) (stating that under Minnesota law, "contract performance is excused when it is hindered or rendered impossible by the other party") (internal quotations omitted); In re Econ. Lodging Sys., Inc., 226 B.R. 840, 844 (Bankr. N.D. Ohio 1998) (citing Texas law and concluding that when "one party to a contract wrongfully prevents the other party's performance, that action constitutes a breach of contract entitling the party wronged to recover damages for that breach"). I understand that all such cases are state court cases or federal cases applying state law. But the common law on this point seems truly common among the various sovereigns in our system and suggests a deeper and more general view across time that "[e]ach party to a contract impliedly agrees not to prevent the other party from performing and not to render performance impossible." Barrett v. Gilbertson, 827 N.W.2d 831, 840 (N.D. 2013) (internal quotations omitted).

I also recognize of course that there was no *express* contract here between the Commissioner and the Melaskys, but the Melaskys did rely on the Commissioner's revenue procedure when they tendered their $18,000 check. That revenue procedure says: "[A]t the time the taxpayer voluntarily *tenders* a partial payment that is accepted by the Service and the taxpayer provides specific written directions as to the application of the payment, the Service will apply the payment in accordance with those directions." Revenue Procedure 2002-26, sec. 3.01, 2002-1 C.B. 746, 746 (emphasis added). The revenue procedure's plain language seems to indicate that the tender date is what counts; at the very least, in the unusual circumstance when the Commissioner levies on an account before a tendered check is cashed, Rev. Proc. 2002-26 creates some ambiguity as to whether the tender date or the clearing date controls.

And on that point there was truly a gap in the law, because the IRS did in fact get the money in the Melaskys' account. In that sense the check was "duly paid" under section 6311(b). The Commissioner asserts, and the majority assumes, that he was paid by levy and not by check. But on the question of what "duly paid" means when there was neither payment of the check in the ordinary course nor insufficient funds to pay the check if it had been presented, there is no command for us to obey in the Constitution, a statute, or a regulation. When that

happens, the default authority to create a reasonable rule falls by long tradition on the courts when necessary to decide a case. I think that the principles of noninterference in contract law give us a good rule for this gap when made only a bit more general--that when a statute binds government and citizen, it should and does incorporate the background norm that neither should prevent the other from performing its duty. I would specifically hold in this case that as a matter of law the IRS should not frustrate a taxpayer's attempt to make a voluntary payment. Levying on the very bank account from which a voluntary payment is coming is a direct interference, and I would create a clear bright-line rule:[16] A taxpayer can

---

[16] In other words, I would adopt a generally applicable rule of law that would not only constrain the IRS but would "constrain myself as well." See Antonin Scalia, "The Rule of Law as a Law of Rules," 56 U. Chi. L. Rev. 1175, 1179 (1989). Judge Lauber in his concurrence ignores my *bright-line rule*; he says instead that I would create a new rule of law "out of whole cloth, *specifically designed to suit the peculiar facts of this case*." See Lauber op. p. 48 (emphasis added).

It is not enough to point out that the Melaskys could've made a stronger argument about reallocating the levy proceeds and conclude that the "SO did not commit legal error by failing to address an argument petitioners did not make." See Lauber op. p. 55. Judge Lauber admits that the Melaskys laid out the relevant facts for the SO--they tendered an $18,000 check, designated to their 2009 liability, and the IRS levied on their account before cashing the check. Id. p. 53. He also recognizes that the Melaskys requested the appropriate relief--to reallocate the levy proceeds to the 2009 tax year. Id. But he thinks the SO didn't need to consider any of those facts or their request for relief or the ambiguity of the Code's phrase "duly paid;" he was required only to rely on "accurate information appearing on the taxpayer's account transcripts and appl[y] the IRS rules and

(continued...)

apply a voluntary payment to the tax liability of his choosing by tendering a check; if it bounces, the Commissioner does not need to honor that application; but if the Commissioner causes the bouncing, he must.[17]

---

[16](...continued) procedures." Id. p. 52.

One also wonders whether Judge Lauber is suggesting in his concurrence that the Court apply the framework from Dalton v. Commissioner, 682 F.3d 149, 157 (1st Cir. 2012), rev'g 135 T.C. 393 (2010) and T.C. Memo. 2011-136, to this issue--asking not whether the SO applied the correct rule of law but whether he "applied a reasonable view of what the law is or might be." I would agree that that framework is appropriate for other questions in this case, see infra p. 106, but Judge Lauber indicates more generally in his concurrence that an SO doesn't abuse his discretion even if he got the law wrong so long as we can say the taxpayer didn't perfectly formulate his argument. See Lauber op. p. 54. What about a taxpayer who argues simply that it's too late to collect a tax instead of saying that the statute of limitations on collection under section 6502(a) has expired? Would an SO abuse his discretion if he ignored that taxpayer's argument, even if the taxpayer was right? That seems like a "gotcha" approach to our CDP review, and an approach that is particularly harmful in cases like this where our Court needs to clarify the appropriate rule of law for the IRS *and* taxpayers. I think the SO abused his discretion on this issue if he failed to properly apply my proposed generally applicable rule of law, and that's true even if it's the first time we ourselves would be applying that rule. See, e.g., Weiss v. Commissioner, 147 T.C. 179, 187 (2016), aff'd, 121 A.F.T.R.2d (RIA) 2018-1853 (D.C. Cir. 2018).

[17] This bright-line rule is also consistent with the plain language of the Commissioner's own revenue procedure, which says that, when the Commissioner accepts a voluntarily tendered check in partial payment of taxes, he must apply the payment as the taxpayer instructs. See Rev. Proc. 2002-26, sec. 3.01, 2002-1 C.B. at 746.

I can sympathize--if only a little--with the Commissioner's position here. The Melaskys had a large outstanding tax debt that the IRS has a right to collect. The IRS did nothing morally wrong or even negligent. But the fact is that the Melaskys' check didn't clear because of something the IRS did. Just as parties to a contract generally can't interfere with each other's performance, I think the best rule is one that says the IRS generally can't interfere with a taxpayer's attempt to perform his legal obligation to pay the tax he owes. I would therefore hold as a matter of law that the Melaskys made a tax payment on January 27, 2011. This payment was voluntary and they designated it to pay their 2009 tax liability. The IRS should've applied the payment as they directed, and the SO abused his discretion--committed an error of law--when he concluded that the IRS received an involuntary payment instead.

## II.

## A.

The second issue in this case is whether the SO abused his discretion when he rejected the Melaskys' proposed collection alternative. He had two alternative grounds for his decision. The first was that the Melaskys "have not paid over the equity in all of their assets." The record shows that this issue arose when he wrote the Melaskys in December 2011. He asked them to liquidate or borrow against

their assets and to apply the proceeds against their outstanding tax liabilities, and to do so within two weeks.[18] Over the course of the next few months, the Melaskys were able to liquidate some, but not all, of their assets--even the $9,000 or so in proceeds from a defined-contribution plan that Mrs. Melasky's father had made her the beneficiary of, but about which she had been unaware until the CDP process was underway. The SO extended the deadline until April 2012. Even with this extension, the Melaskys failed to liquidate an IRA which held $1,588.42; a 401(k) plan worth $2,283.37; a life-insurance policy whose terms required cancellation if its small cash value was claimed; and 64 ExxonMobil shares (worth $2,567.68) jointly owned by Mr. Melasky and his ex-wife and registered directly with the company.[19]

---

[18] He also asked them to list the value of assets that were in the estate of Mrs. Melasky's father. We discuss this problem in the next section.

[19] Stock registered directly with the issuer is typically more complicated to sell than the publicly traded stock that most Americans own. The official title holder of most publicly traded securities, and possessor of most physical stock certificates, is Cede & Co.--"the nominee name used by The Depository Trust Company ('DTC'), a limited purpose trust company organized under New York law for the purpose of acting as a depository to hold securities for the benefit of its participants, some 600 or so broker-dealers and banks." U.C.C. art. 8 (1994) (prefatory note); see also Calloway v. Commissioner, 135 T.C. 26, 56-57 (Holmes, J., concurring), aff'd, 691 F.3d 1315 (11th Cir. 2012). "The U.C.C.'s drafters estimate that somewhere between sixty and eighty percent of publicly traded securities are held by the brokers and banks that participate in the DTC. If

(continued...)

The Melaskys told the SO that they were just waiting for checks from the IRA and 401(k) plan. They asked that they be able to keep the life-insurance policy and simply pay over its cash surrender value of $1,199.98 to avoid its cancellation. The ExxonMobil stock was a different problem: Mr. Melasky told the SO that he hadn't spoken to his ex-wife in decades and that he couldn't sell the stock without her. He instead offered to sign over his interest in the stock to the IRS. Then, before the last deadline passed, the Melaskys gave the IRS a check for more than $9,000 to be applied against their estimated 2012 tax bill.[20]

This voluntary payment for a later year completely confused the SO, who wrote:

---

[19](...continued)
someone within this large network of brokers sells stock to a purchaser also within the network, the purchase and sale are netted against each other and the underlying stock remains in Cede & Co.'s name." Calloway, 135 T.C. at 57 (Holmes, J., concurring) (citing U.C.C. art. 8 (1994) (prefatory note)). When stock is registered with the issuer, however--as Mr. Melasky's and his ex-wife's ExxonMobil shares were--if the owners wanted to sell, then ExxonMobil (or its transfer agent) would have to register the transfer. See U.C.C. art. 8 (1994) (prefatory note). That, of course, would've made it more difficult for the Melaskys to sell the stock quickly.

[20] IRS guidelines require a taxpayer to be current with tax filing and payment requirements before he can qualify for an installment agreement. See Internal Revenue Manual (IRM) pt. 5.14.1.2(8)(f) (Sept. 26, 2008); see also Giamelli v. Commissioner, 129 T.C. 107, 111 (2007).

These funds were received by Audrey Melasky in March 2012 as a non-spousal beneficiary of her father's defined contribution plan at Methodist Hospital. The asset was not listed on Form 433-A dated June 21, 2011. Although this payment is greater than the equity in the Exxon stock, Mony Life policy, Charles Schwab account and SCH 401k plan, the funds were received from a separate asset. Therefore, the taxpayers have not paid over the equity in all of their assets.

Mrs. Melasky's dad had died less than six months before they filled out the Form 433 listing their assets, income, and expenses. There is nothing in the record to suggest that her share of her dad's old retirement plan was known to her then. There is nothing in the record to suggest that she wasn't entitled to apply it against her estimated 2012 tax bill. There is nothing in the record even to tell us whether it was taxable to her for 2012, the year when she seems to have received it.

Yet because it was money received "from a separate asset," the SO reasoned that the Melaskys had not "paid over the equity in all of their assets." He never considered their alternative of paying over the cash surrender value of the tiny insurance policy or somehow dealing with the entangled interest Mr. Melasky had in an odd lot of ExxonMobil stock. This is startling--people pay tax bills from "separate assets" all the time (e.g., borrowing from credit cards or against the equity of their homes). Neither party, the majority today, nor my own research has

uncovered anywhere else where this reasoning in a notice of determination is used as a justification for rejecting a collection alternative.

B.

This doesn't stop the Court today from again ignoring the <u>Chenery</u> rule and coming up with alternative reasons to sustain the SO's determination. The majority reasons that "respondent asked petitioners to liquidate their assets and pay over the proceeds; they had not done so as of April 20, 2012, when the notice of determination was issued." <u>See</u> op. Ct. p. 33. On the specific problem of Mr. Melasky's jointly owned ExxonMobil stock, the majority sees no abuse of discretion by the SO because

> [p]etitioners do not contend that Mr. Melasky would have been unable to liquidate his interest in that stock by communicating with his former spouse, initiating a partition action in the appropriate court, or borrowing against his interest in the stock. It was not unreasonable for the SO to ask Mr. Melasky to do so. * * *

<u>Id.</u> p. 34 (fn. ref. omitted).

If the SO had actually relied on this, it sure would have been unreasonable if, unlike the majority, one considers the value of the assets involved. What sensible person would start a partition action over an asset worth less than $3,000? What is unreasonable about paying over the value of an insurance policy rather

than requiring it to be surrendered and canceled? How could Mr. Melasky even get a secured loan on a jointly owned asset not part of the DTC system? And what does any of this have to do with the actual reasoning of an SO who stated that the failure to liquidate any asset, or make payments from a separate asset, entitled him to reject a collection alternative out of hand?

## C.

Let us return again to a proper review of this issue under Chenery. The SO concluded that the Melaskys were ineligible for a PPIA because they didn't liquidate all their assets by his deadline. He explained in the notice of determination that he followed the IRM because, before granting a PPIA, "equity in assets must be addressed and, if appropriate, be used to make payment." See IRM pt. 5.14.2.1(2) (Mar. 11, 2011). There's certainly good reason to make taxpayers use the equity in their assets before entering into installment agreements, especially PPIAs. Without such a rule, taxpayers could build up equity and claim they can't pay past-due taxes. But the system recognizes that some assets are very hard for their owners to use to pay taxes, and the IRM recognizes that "[a] PPIA may be granted if a taxpayer does not sell or cannot borrow against assets with equity." Id. pt. 5.14.2.1.2(2).

The record shows that none of that was considered here. The SO didn't exercise the discretion he had to consider a collection alternative even if some illiquid assets remained unliquidated, and his interpretation of the effect of the Melaskys' $9,000 voluntary payment of their 2012 tax bill was arbitrary and capricious. The record shows that the Melaskys made a good-faith effort to marshal their assets, liquidate them, and in some cases provided acceptable alternatives. By the time the SO made his determination, the Melaskys had liquidated all but one IRA, one 401(k), the life-insurance policy, and the ExxonMobil stock. And their lawyer explained in a letter to the SO that the Melaskys were awaiting checks from the IRA and the 401(k), and documentation relevant to the IRA liquidation request is in the record.

The SO also didn't doubt that the IRA and 401(k) checks were on the way-- he says in the notice of determination that "[t]he taxpayers are still waiting on a check from the Charles Schwab [IRA] account and the SCH Services 401(k) plan and will forward these funds to the IRS upon receipt." The Melaskys asked that the SO allow them to keep the life-insurance policy and simply pay over its cash value, which seems to be a perfectly reasonable alternative that the SO didn't even address. Finally, the Melaskys repeatedly told the SO that the ExxonMobil stock was held jointly by Mr. Melasky and his ex-wife, whom he hadn't spoken with in

many years.  Not believing it would be possible to liquidate the stock, the

Melaskys offered to sign their interest in the stock over to the IRS, or let the IRS

seize it.

I see nothing in the SO's reasoning to suggest that something like this might

not be a reasonable alternative.  The Supreme Court has held that the federal tax

lien attaches to a taxpayer's property held in a tenancy by the entirety, see United

States v. Craft, 535 U.S. 274, 283, 288 (2002), and the Commissioner himself has

recognized that it's logistically difficult to seize this kind of property, see Notice

2003-60, 2003-2 C.B. 643, 645 ("[T]he Service has determined that an

administrative sale is not a preferable method of collection with respect to

entireties property.")[21]  This is especially true when the IRM uses the following

example of a case where failing to liquidate the asset is permissible:  "[T]he

---

[21] It's likely, but not to be found in the administrative record, that the stock was at some point community property, rather than held by Mr. Melasky and his ex-wife as tenants by the entirety.  But even assuming that it is now in some form of joint tenancy, the Commissioner's tax lien would be less effective for the stock than for most of the other tangible and intangible property that the Melaskys owned in that he might have trouble enforcing the lien against an innocent third-party purchaser of their stock.  See sec. 6323(b)(1) (even if a notice of federal tax lien was properly filed, it's invalid (A) "as against a purchaser of [a] *security* [e.g., a "share of stock," see sec. 6323(h)(4)] who at the time of purchase did not have actual notice or knowledge of the existence of such lien," and (B) "as against a holder of a security interest in [a] *security* who, at the time such interest came into existence, did not have actual notice or knowledge of the existence of such lien" (emphasis added)).

property is held as a tenancy by the entirety when only one spouse owes the tax

and the non-liable spouse declines to go along with the attempt to borrow, and the

property does not appear to have been transferred into the tenancy to avoid the tax

collection." IRM pt. 5.14.2.1.2(2)(b).

None of that matters because the SO simply concluded without any analysis

that failing to liquidate every asset is an automatic bar to getting a PPIA. He cited

the IRM as support, but miscited it by overlooking the part that says that there are

situations where failures to liquidate some assets may be excused. I wouldn't say

that the IRM gave the Melaskys any enforceable rights, see, e.g., Thompson v.

Commissioner, 140 T.C. 173, 190 n.16 (2013), but the Melaskys provided

reasonable explanations and alternatives, and not addressing them violated the

Code's own requirement that the SO must consider "offers of collection

alternatives," see sec. 6330(c)(2)(A)(iii), (3)(B).

III.

A.

The second alternative ground for the SO's rejection of a collection

alternative was the Melaskys' refusal to take liquidating distributions from a

testamentary trust of which Mrs. Melasky was a beneficiary and trustee. The

Melaskys argued that doing so would violate Mrs. Melasky's fiduciary duty as

trustee to other beneficiaries unless she needed to do so for her own health, maintenance, support, and education. They argued that she had enough income of her own to support herself and that in the absence of need could not, consistent with the trust's terms, distribute money to herself.

This raises a nice question--in calculating a taxpayer's reasonable collection potential SOs are not supposed to reduce a taxpayer to utter penury. See, e.g., sec. 301.6343-1(a), (b)(4), Proced. & Admin. Regs. (IRS *must* release levy if taxpayer can't pay "reasonable basic living expenses"); IRM pt. 5.15.1.7 (Oct. 2, 2012) (allowable-living-expenses standard for evaluating collection alternatives). They are not supposed to just look at projected income, but offset it with reasonable expenses. The conundrum here is that the trigger for Mrs. Melasky to distribute money from the trust is that she determine it to be "appropriate to provide for *their* [i.e., in context, the class of beneficiaries that includes, but is not limited to, Mrs. Melasky, herself] continued health, maintenance, support, and education."

In the SO's view, the terms of the trust made no distribution contingent on Mrs. Melasky's inability to support herself through nontrust income. The record shows that the SO reached this conclusion only after consulting with an estate tax Appeals officer in the IRS Appeals Office. He determined that the IRS could demand that Mrs. Melasky pay her living expenses out of trust distributions. By

doing so, Mrs. Melasky could free up her other income for tax payments. Taking this into consideration, the SO calculated what he thought would be a reasonable monthly payment. Relying on advice from the estate-tax Appeals officer, the SO decided that the Melaskys' true ability to pay would only be properly reflected by Mrs. Melasky's using some distributions from her trust to pay her living expenses. The SO limited these hypothetical distributions to the payment of Mrs. Melasky's expenses alone. The SO didn't include taxes in this calculation, and he computed Mrs. Melasky's share of the couple's household expenses by equating it with her share of their total income. He determined that Mrs. Melasky earned 68% of the monthly household income, and that she therefore burned up 68% of the monthly expenses. This all led to his conclusion that Mrs. Melasky could use trust distributions to pay $4,707 of living expenses and could afford to pay that much each month to pay off their tax debts until the trust corpus ran out.[22]

---

[22] The Melaskys owe more than $300,000 for their tax years spanning (with only a few gaps) 1995 through 2009, but the only years covered by their CDP hearing were 2006, 2008, and 2009--years for which they owed only $23,000. A taxpayer is entitled to only one CDP hearing--from which he can seek judicial review in Tax Court--for each tax liability and year, see sec. 6330(b)(2), (d)(1); sec. 301.6330-1(b)(1) and (2), Q&A-B2, Q&A-B4, Proced. & Admin. Regs., and he has only 30 days from the day after he receives an NIL to request that hearing, see sec. 301.6330-1(c)(1), Proced. & Admin. Regs. The Melaskys' CDP hearing covered only 2006, 2008, and 2009, because the SO found--and the Melaskys don't dispute--that they had not timely requested a CDP hearing for the other

(continued...)

How should we review this kind of determination?

## B.

The majority assumes that this is a question of law, and concludes that the language of the trust is so unambiguous that no Texas court would allow any extrinsic evidence. See op. Ct. p. 37. It reasons that we can decide ourselves what the trust instrument says; and if we reach the same result as the SO, there's no error of law, which means no abuse of discretion. See, e.g., Fargo v. Commissioner, 447 F.3d 706, 709 (9th Cir. 2006) ("Abuse of discretion occurs when a decision is based on an erroneous view of the law or a clearly erroneous assessment of the facts") (internal quotations omitted), aff'g T.C. Memo. 2004-13. The majority again goes way outside the reasoning that the SO put in the notice of determination, and again does so with not even a nod to Chenery.

---

[22](...continued)
years. When the Melaskys offered an installment agreement as a collection alternative, however, the IRM required the SO to nonetheless consider their total unpaid balance for *all* open tax years. See IRM pt. 5.14.1.4.1(2) (Sept. 26, 2008) ("Ensure *all balance due modules* * * * are included in [installment] agreements"); IRM pt. 5.1.1.3.6(3) (Oct. 12, 2010) (In CDP context, "alternative collection actions generally apply to all outstanding tax debts, regardless of whether they are the subject of the CDP hearing"). The IRM is even clearer on this point now than it was when the Melaskys had their CDP hearing. See IRM pt. 8.22.7.1(2) (Nov. 5, 2013) ("[a]ll open tax periods must be included when resolving a case through * * * Installment Agreement").

It concludes this section of its analysis by stating that "petitioners' case presents no genuine dispute as to what would happen under Texas law if Mrs. Melasky had other income or assets available to pay her expenses." See op. Ct. p. 40. This is not the right standard when we review administrative action-- though this case is before us on cross-motions for summary judgment, the only genuine factual disputes that we should be looking for are disputes as to the contents of the administrative record. See Kasper, 150 T.C. at ___ (slip op. at 20-21); see also, e.g., Rempfer v. Sharfstein, 583 F.3d 860, 865 (D.C. Cir. 2009) (trial judge sits as "appellate tribunal" when a party seeks review of agency action under APA--"[t]he entire case on review is a question of law, and the complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action") (internal quotations omitted).[23]

---

[23] There are some other places where we intimate that our review is of the underlying facts rather than the reasoning from an administrative record compiled by the SO. See op. Ct. p. 3 (saying that the "undisputed facts are derived from the parties' filings"); id. pp. 12, 18, 33 (noting over and over that the Melaskys "claimed" Mr. Melasky jointly owned ExxonMobil stock with his ex-wife--a fact that the SO never questions in the administrative record); id. note 20 (saying that the Melaskys "claim" they didn't know about Mrs. Melasky's father's defined contribution plan before he died--another fact the SO doesn't question); id. p. 21 (reproducing standard language for standards of summary judgment); id. pp. 33-34 (taking facts in light most favorable to the Melaskys and "assuming that they were

(continued...)

I don't even think the statement is true. The Melaskys argue that the SO abused his discretion when he concluded that Mrs. Melasky could've made discretionary distributions from the trust to pay living expenses when she otherwise could afford to pay them. The Melaskys believe these distributions would violate the language of the trust agreement and violate Mrs. Melasky's fiduciary duties to the secondary beneficiaries. They argue that the SO couldn't consider these distributions in his analysis because Mrs. Melasky couldn't legally make them. They also argue that the SO's determination that they could apply the proceeds to living expenses and pay the taxes with their own money that they otherwise would've spent on their expenses is simply a runaround of the prohibition on direct payments from the trust to the IRS.

I do agree that if we were to interpret the provisions of the will and trust ourselves, we would have to do so in light of state law--in this case, Texas law. See Estate of Sumner v. Commissioner, 59 T.C. 837, 842 (1973). "Under Texas law, the cardinal rule to be followed in construing a will is to ascertain the intent of the testator." Id.; see also Keisling v. Landrum, 218 S.W.3d 737, 741 (Tex. App. 2007). I also agree with the majority that if we did so, we would start with

---

[23](...continued)
sincere in initially claiming" they paid medical expenses with some of their assets).

the document itself, and if it's unambiguous, limit our review to its four corners. Keisling, 218 S.W.3d at 741. But if the settlor's intentions can't be determined by reviewing the document alone, a Texas court would be able to admit parol evidence to help it interpret the language. Estate of Sumner, 59 T.C. at 842; see also First Nat'l Bank of Beaumont v. Howard, 229 S.W.2d 781, 783 (Tex. 1950). This could include "consideration of the value of the estate, the previous, [sic] relations between [the settlor] and the beneficiaries, and all the circumstances in regard both to the estate and the parties existing when the will was made and when the settlor died." First Nat'l Bank of Beaumont, 229 S.W.2d at 783.

This means that a court would ultimately have to decide whether Mrs. Melasky's father wanted her, as trustee, to exhaust her other sources of income before she made distributions of the trust property to herself. The Melaskys seem to argue that the will made it clear that she would have to exhaust these other sources. If they are right, the SO abused his discretion. They claim that by using the language "as the Trustee determines to be appropriate to provide for *their* continued health, maintenance, support, and education," Mrs. Melasky's father intended there to be trust money for her descendants (because he used the plural "their"). To that extent, they claim she would've violated her fiduciary duties to those secondary beneficiaries by spending the money on herself. Article 9.1 of the

will also specifically allows the trustee to consider "all other income and resources reasonably available to the beneficiaries" when deciding to make distributions.

The Commissioner, on the other hand, points out that article 9.1 says that the trustee "may consider" other income. It doesn't say she has to. The SO himself concluded that nothing in the will makes trust distributions conditional or dependent on the amount of income Mrs. Melasky earned. Article 9.1 also specifically says that "[e]xcept as otherwise provided, as to any trust with more than one beneficiary, the Trustee may make discretionary distributions in equal or unequal proportions and to the exclusion of any beneficiary."

And this bit of introduction is only a preliminary start to an overview of the intricacies of this question. Texas courts asked to determine a settlor's intent conduct much deeper analyses. The court in First Nat'l Bank of Beaumont, 229 S.W.2d at 784-85, had to decide whether the settlor intended that the trustee pay trust principal to the settlor's daughter when it was clear her family was struggling. The settlor had two daughters and had always treated them equally, even when setting up a trust for them. Id. at 783. The trustee didn't distribute any trust principal to the struggling daughter, and the trial court held it had to. Id. at 784. But the trial court also held it had to make equal distributions to the other daughter, regardless of her need for them. Id. The Texas Supreme Court

ultimately concluded that it was the settlor's intent that "in making payments out of the corpus of the estate [to either daughter], the trustee is authorized to do so only on basis of need." Id. at 786. The supreme court disagreed with the trial court's requirement that the trustee make a matching distribution to the other sister who was doing fine on her own. See id. at 786-87.

In another case, the court of appeals of Texas in Keisling, 218 S.W.3d at 740, had to interpret the meaning of a trust that required the beneficiary to use her own income and "other financial resources." The question it had to decide was whether this language meant the beneficiary had to sell assets to maintain her standard of living before the trustee could distribute money to her. Id. The court concluded it did not: The beneficiary had lived a very lavish lifestyle before the settlor died, and it was clear to the court that he intended that she continue to enjoy this lifestyle, which included the ownership of expensive assets. Id. at 742-43.

My point here is to show that this question is a difficult one to answer. In both of these cases there were Texas trial courts, certainly more experienced in Texas law than either we or the SO are, reversed by higher courts on their findings about the intent of the settlors. With that in mind, did the SO here have to get it right? Or, put another way, is this a question of law whose answer the SO must get right lest we find him to have abused his discretion?

C.

These questions show another way in which the majority doesn't even ask the right question. We have often previously said that when we review a strictly legal conclusion of a CDP hearing, the standard of review is irrelevant because under either an abuse of discretion review or *de novo* review, "we must reject erroneous views of the law." Kendricks v. Commissioner, 124 T.C. 69, 75 (2005). But our view was challenged by the First Circuit in Dalton v. Commissioner, 682 F.3d 149, 157 (1st Cir. 2012), rev'g 135 T.C. 393 (2010) and T.C. Memo. 2011-136. The Court of Appeals in Dalton had a different view of our review of CDP determinations: "It is not our role, as a court reviewing findings made in the course of a CDP hearing, to determine whether the IRS applied the correct rule of law. * * * [W]e need only determine whether the IRS applied a reasonable view of what the law is or might be." Id. I'm mindful that the D.C. Circuit hasn't yet considered whether to agree with Dalton, but other circuits have at least cited it. See Williams v. Commissioner, 718 F.3d 89, 92 (2d Cir. 2013); Tucker v. Commissioner, 506 F. App'x 166, 168 (3d Cir. 2012), aff'g T.C. Memo. 2012-30. And it is our custom--breached here by the majority--to consider contrary circuit precedent in a case which presents the issue, but where appellate venue lies elsewhere.

I think this is one such case. I'm sufficiently self-aware to notice that in the first section of this dissent I would find the SO to have abused his discretion by failing to follow a legal rule that I would recognize for the first time in this case. But this just shows that there are different kinds of questions of law, and some come mixed in with very complicated facts. When factfinding gets mixed up with finding the right rule of law to apply, I would agree with the First Circuit that we need to be mindful of Congress's decision to make CDP hearings informal and without the more precise, thorough, but inevitably more expensive *de novo* trials we hold in deficiency cases. See Dalton, 682 F.3d at 155-56 (CDP process neither allows for discovery nor brings together all interested parties, and doesn't allow cross-examination); see also Tucker, 506 F. App'x at 168 (review "deferential" given informal nature and limited scope of CDP proceedings).

But there are also issues that fall on the more purely legal end of the spectrum. In Kendricks, 124 T.C. at 76-77, for example, the issue was whether a taxpayer's ability to challenge his tax debt in bankruptcy precluded him from challenging it again in a CDP hearing (because a taxpayer can challenge the underlying liability in a CDP hearing only if he never had a previous opportunity to do so). See also sec. 6330(c)(2)(B). Our answer to this question applied with general effect to many future taxpayers.

We have reasoned, for example, that the mailing date of a notice of intent to levy, instead of the date on the form itself, started the 30-day period in which the taxpayer has to request a CDP hearing. Weiss v. Commissioner, 147 T.C. 179, 191 (2016), aff'd, 121 A.F.T.R.2d (RIA) 2018-1853 (D.C. Cir. 2018). We noted that our review would be the same if we reviewed *de novo* or for an abuse of discretion, "[b]ecause we must decide whether the SO correctly determined that the limitations period had not expired." Id. at 187. Our holding generally applied to future cases and depended little on the particulars of the case. The APA tells judges that they have to decide questions of law, see 5 U.S.C. sec. 706, and these sorts of questions are ones whose answers we can decide ourselves.

Dalton was not like that. At issue there was who owned a piece of property when one party claimed to be the nominee of another. Dalton, 682 F.3d at 154. A final decision about who owns property has legal effect, but requires meticulous factfinding. The First Circuit itself said that "such questions are notoriously fact-intensive." Id. at 155. A conclusion about who owns property under such-and-such circumstances affects future cases less by articulating a general rule than by describing a set of facts whose similarity to those of other cases helps the law creep forward by analogy.

We've implicitly recognized this distinction ourselves after <u>Dalton</u>. In <u>Porro v. Commissioner</u>, T.C. Memo. 2014-81, at \*17-\*18, <u>aff'd</u>, 589 F. App'x 502 (11th Cir. 2015), the taxpayers had a deed that supposedly showed their son owned a piece of property. But there were some inconsistencies in the record, such as state assessment records listing the taxpayers as the owners. <u>Id.</u> at \*18. The IRS concluded after a CDP hearing that the taxpayers were still the owners. <u>See id.</u> Ownership is in part a legal question, but we did not conduct any further factfinding in our review. <u>See id.</u> We instead reasoned that the settlement officer "documented in the IRS case activity file her thought process in determining that [the taxpayers] were the owners of the [property]" and that she "was not required to conduct a further investigation." <u>Id.</u> at \*18-\*19; <u>see also</u> <u>Ang v. Commissioner</u>, T.C. Memo. 2014-53, at \*23 (citing <u>Dalton</u> to conclude an IRS determination to sustain a jeopardy assessment was reasonable).

The Melaskys' case is on this issue more similar to <u>Dalton</u> and <u>Porro</u> than it is to <u>Kendricks</u> and <u>Weiss</u>. Unlike the purely legal questions of <u>Kendricks</u>, the questions the SO here faced were mixed questions of fact and law about a decedent's intent, and when that is the case we are "to consider whether the *factual and legal* conclusions reached at a CDP hearing are reasonable, *not whether they are correct*." <u>Dalton</u>, 682 F.3d at 156 (emphasis added). The

question is a mixed one here because, although the rule in Texas is that the intent

of the testator is to be ascertained from the language of the will, parol evidence

can be used to explain the terms of the will "in order that his will may be read in

the light of the circumstances in which he was placed at the time of making it."

Estate of Sumner, 59 T.C. at 842 (citing Hunt v. White, 24 Tex. 643, 651

(1860)).[24]  Just as in Porro, the SO here similarly documented his thought process,

and noted that nothing in the will specifically required trust distributions to be

contingent on Mrs. Melasky's income.  He also reached out to an estate-tax

Appeals officer, who told him he could take this approach.  This isn't what a

Texas court would do under Texas law, but I would find it reasonable.[25]

---

[24] Research shows that some states have more general rules on this question. Compare In re Estate of Paster, 198 N.Y.S.2d 441, 442-43 (Surr. Ct. 1960) ("Our courts have repeatedly held that when an absolute gift of support and maintenance is made the outside resources of the beneficiary are not to be considered. * * * Even where invasion of the principal is permitted only for purposes of emergency or necessity a trust beneficiary is not required to resort to his own capital assets for support and maintenance"), with Guar. Tr. Co. of N.Y. v. N.Y.C. Cancer Comm., 144 A.2d 535, 537 (Conn. 1958) ("in considering whether any invasion of principal at all is warranted, we see nothing to obviate the operation of the general rule requiring that other resources of the beneficiary, both principal and income, must be substantially exhausted before any invasion of the corpus is authorized"). I've found no such general rules under Texas law and thus conclude a proper analysis would have as its primary concern the intent of the settlor.

[25] One might argue that the SO should've done more legal research before making his conclusion.  But this very well might have been fruitless.  The court in

(continued...)

It's possible that if we did a full analysis of the trust documents and gathered any other evidence we deemed necessary to figure out the settlor's true intentions, we might find that Mrs. Melasky couldn't make trust distributions without first considering her other income sources.[26] One also can't deny that the

---

[25](...continued)
In re Will of Tuthill, 76 N.W.2d 499 (Minn. 1956), dealt with a question of whether the trustee had to consider the beneficiary's independent resources. The court aptly pointed out that "[a]bout all that can be said is that authorities may be found to support any view. In the construction of language used in a testamentary trust, precedents are not of great value." Id. at 502. The answer here would only become clear after an intensive factfinding proceeding, something a CDP hearing certainly is not, see Dalton, 682 F.3d at 155, and that makes one wonder why the majority emphasizes missing "witness testimony" and "parol evidence" that the Melaskys might've offered to make their case in an informal CDP hearing, see op. Ct. notes 16, 31.

[26] There's also the question of whether direct tax payments themselves can count as maintenance and support. The Commissioner points out that even though the Appeals officer thought taxes didn't count, this conclusion could itself be wrong. Perhaps it is. See, e.g., In re Guinness' Trust, 138 N.Y.S.2d 172, 173-74 (Sup. Ct. 1955) (concluding that the trustee could distribute £18,000 to the beneficiary of a support trust to pay taxes she owed the British government because the language governing distributions to provide for her "proper care, comfort, and support * * * included not merely a sufficiency for food, raiment and lodging, but also whatever is requisite to give security from want and financial embarrassment, and relief from anxiety resulting therefrom"); Leslie Kiefer Amann, "Discretionary Distributions: Old Rules, New Perspectives," 6 Est. Plan. & Community Prop. L.J. 181, 208 (2014) (stating that "[t]ax preparation and payment" is a type of living expense contemplated by support trusts).

trust provisions allow the trustee at least to consider outside income.[27]  On the other hand, perhaps we'd have evidence that showed Mrs. Melasky's father was aware of her crippling tax debts and wanted to provide for her so she could maintain a certain standard of living despite the Commissioner's collection efforts.

But we aren't being asked to do this.  We have instead a fact-intensive subsidiary (or "preludal") legal issue that presented itself in a CDP hearing, before an SO incapable as a matter of training of deciding it as a trial judge would; and, more importantly, deprived of all the extensive and expensive factfinding weapons a trial judge could wield.  This may harm taxpayers in some cases, while the lower cost of informal adjudication benefits them in others.  It's up to Congress to decide which is best; and here Congress has opted for informal adjudication.  That makes our review of such mixed questions an appropriate place to depart from the stricter standard that we would apply on purely legal issues.  Doing so would also nudge us closer to the mainstream of administrative law.  See, e.g., Steve R. Johnson,

---

[27] As we previously noted, the trust used a permissive "may" rather than a mandatory "shall".  See Amann, supra, at 188 (noting that "[t]he term 'may' means maybe-use discretion.  The term 'shall' means mandatory-just do it").  As the First Circuit observed in Dalton, however, "the existence of these contradictory facts is not enough to tip the scales in a reasonableness analysis.  After all, the question is not the correctness vel non of the IRS's determination * * *.  Rather, the question is whether the IRS's determination, correct or not, falls within the wide universe of reasonable outcomes."  682 F.3d at 159.

"Reasoned Explanation and IRS Adjudication," 63 Duke L.J. 1771, 1808 n.231 (2014) ("The Tax Court and generalist courts often use the same words but are animated by different spirits in applying them. Abuse-of-discretion review in the Tax Court is notably stricter than such review in the district and circuit courts") (citing Dalton, 682 F.3d at 155).

Dalton reminds us to take into consideration the "peculiar nature of the CDP process"--that "a court's role in the CDP process is simply to confirm that the IRS did not abuse its wide discretion," which includes "ensur[ing] that the agency's subsidiary factual and legal determinations were reasonable." Dalton, 682 F.3d at 154. The Fifth Circuit (another possible appellate venue) has itself recognized this in a general way: "Congress likely contemplated review for a clear abuse of discretion in the sense of clear taxpayer abuse and unfairness by the IRS, lest the judiciary become involved on a daily basis with tax enforcement details that Congress intended to leave with the IRS." Christopher Cross, Inc. v. United States, 461 F.3d 610, 612 (5th Cir. 2006) (quoting Robinette v. Commissioner, 439 F.3d 455, 459 (8th Cir. 2006), rev'g 123 T.C. 85 (2004)). We have to determine whether the SO's legal conclusion was reasonable in light of the information available to him after a very informal adjudication, not whether that conclusion was correct.

So I would hold not that the SO got the law right, but that he acted reasonably in answering this question and therefore did not abuse his discretion in rejecting the Melaskys' proposed collection alternative on this ground.

## IV.

Tax law is not a branch of moral philosophy. It should not matter to us how we might characterize the Melaskys' old and large tax debt in reviewing the Commissioner's determination to collect by levy the approximately $23,000 debt at issue for these years. It certainly shouldn't play any role in deciding whether the IRS can decide to treat a voluntary payment as an involuntary one. And in reviewing a CDP determination we should, as always, review on the basis of the administrative record and review only on the reasons that the agency actually gave and not those we can come up with ourselves in support of that decision.

I respectfully dissent because I think the Melaskys' payment was a voluntary one that paid most of the tax debt at issue in this case.[28] I would

---

[28] As I've explained, see supra note 20, the IRM says the SO had to consider the Melaskys' entire $300,000 unpaid tax liability when he evaluated their installment-agreement offer--even though that giant total was made up mostly of liabilities from years that weren't eligible for a CDP hearing. The years for which a CDP hearing was available--the only years for which the SO made the determination that we review here--were 2006, 2008, and 2009. See sec. 6330(d)(1); sec. 301.6330-1(b)(1) and (2), Q&A-B2, Proced. & Admin. Regs.; see also Freije v. Commissioner, 125 T.C. 14, 25 (2005) ("our jurisdiction is defined

(continued...)

therefore remand this case to the IRS with instructions to correct that and the other mistakes I've noted. See Indus. Inv'rs v. Commissioner, T.C. Memo. 2007-93, 2007 WL 1219686, at *5 n.6 (harmless procedural errors should also be fixed on remand) (citing Kerner v. Celebrezze, 340 F.2d 736, 740 (2d Cir. 1965)); see also Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 61 (1st Cir. 2001) (warning that "a court must be cautious in assuming that the result would be the same if an error, procedural or substantive, had not occurred, and there may be some errors too fundamental to disregard").

MORRISON, J., agrees with this dissent.

---

[28](...continued)
by the scope of the determination"). The Melaskys owed only about $23,000 for those years. Their $18,000 payment would've made a large dent in that balance, which raises an important question about our jurisdiction: If the $18,000 payment was credited to the Melaskys' 2009 tax year, would we then consider whether the SO abused his discretion when he sustained a levy for a $5,000 tax liability? Or would we also consider the total unpaid tax liability?

We've held before that "our jurisdiction under section 6330(d)(1)[] extends to the consideration of facts and issues in a nondetermination year only insofar as the tax liability for that year may affect the appropriateness of the collection action for the determination year." Freije, 125 T.C. at 28. In Freije, we were asked to consider facts and issues in a nondetermination year only if they were "relevant in evaluating a claim that an unpaid tax has been paid." Id. at 27. Does this mean that a taxpayer in the Melaskys' situation can challenge a rejection of a collection alternative in a way that would undermine the usual prohibition on challenges to the underlying liability? Or should we, when we review the Commissioner's rejection of a collection alternative, look to his exercise of discretion only over the part of the tax liability arising from years over which we have jurisdiction? These are more mysteries that go unsolved today.